# BOWSHER, COMPTROLLER GENERAL OF THE UNITED STATES *v.* SYNAR, MEMBER OF CONGRESS, ET AL.

No. 85–1377. Argued April 23, 1986—Decided July 7, 1986*

---

*Together with No. 85–1378, *United States Senate* v. *Synar, Member of Congress, et al.*, and No. 85–1379, *O'Neill, Speaker of the United States House of Representatives, et al.* v. *Synar, Member of Congress, et al.*, also on appeal from the same court.

716

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, in which MARSHALL, J., joined, *post*, p. 736. WHITE, J., *post*, p. 759, and BLACKMUN, J., *post*, p. 776, filed dissenting opinions.

*Lloyd N. Cutler* argued the cause for appellant in No. 85–1377. With him on the briefs were *John H. Pickering, William T. Lake, Richard K. Lahne*, and *Neal T. Kilminster. Steven R. Ross* argued the cause for appellants in No. 85–1379. With him on the briefs were *Charles Tiefer* and *Michael L. Murray. Michael Davidson* argued the cause for appellant in No. 85–1378. With him on the briefs were *Ken U. Benjamin, Jr.*, and *Morgan J. Frankel*.

*Solicitor General Fried* argued the cause for the United States. With him on the brief were *Assistant Attorney General Willard, Deputy Solicitor General Kuhl, Deputy Assistant Attorney General Spears, Edwin S. Kneedler, Robert E. Kopp, Neil H. Koslowe*, and *Douglas Letter. Alan B. Morrison* argued the cause for appellees Synar et al. With him on the brief was *Katherine A. Meyer. Lois G. Williams* ar-

gued the cause for appellees National Treasury Employees Union et al. With her on the brief were *Gregory O'Duden* and *Elaine D. Kaplan.*†

CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented by these appeals is whether the assignment by Congress to the Comptroller General of the United States of certain functions under the Balanced Budget and Emergency Deficit Control Act of 1985 violates the doctrine of separation of powers.

I

A

On December 12, 1985, the President signed into law the Balanced Budget and Emergency Deficit Control Act of 1985, Pub. L. 99–177, 99 Stat. 1038, 2 U. S. C. § 901 *et seq.* (1982 ed., Supp. III), popularly known as the "Gramm-Rudman-Hollings Act." The purpose of the Act is to eliminate the federal budget deficit. To that end, the Act sets a "maximum deficit amount" for federal spending for each of fiscal years 1986 through 1991. The size of that maximum deficit amount progressively reduces to zero in fiscal year 1991. If in any fiscal year the federal budget deficit exceeds the maxi-

---

†Briefs of *amici curiae* urging reversal were filed for the National Tax Limitation Committee et al. by *Ronald A. Zumbrun, Sam Kazman,* and *Lucinda Low Swartz;* and for Howard H. Baker, Jr., *pro se.*

Briefs of *amici curiae* urging affirmance were filed for the American Federation of Labor and Congress of Industrial Organizations et al. by *Robert M. Weinberg, Peter O. Shinevar, Laurence Gold, George Kaufmann, Edward J. Hickey, Jr., Thomas A. Woodley, Mark Roth, Darryl J. Anderson,* and *Anton G. Hajjar;* for the Coalition for Health Funding et al. by *Stephan E. Lawton* and *Jack N. Goodman;* for the National Federation of Federal Employees by *Patrick J. Riley;* and for William H. Gray III et al. by *Richard A. Wegman, Paul S. Hoff,* and *Thomas H. Stanton.*

Briefs of *amici curiae* were filed for the American Jewish Congress by *Neil H. Cogan;* and for Edward Blankstein by *Eric H. Karp.*

718

mum deficit amount by more than a specified sum, the Act requires across-the-board cuts in federal spending to reach the targeted deficit level, with half of the cuts made to defense programs and the other half made to nondefense programs. The Act exempts certain priority programs from these cuts. § 255.

These "automatic" reductions are accomplished through a rather complicated procedure, spelled out in § 251, the so-called "reporting provisions" of the Act. Each year, the Directors of the Office of Management and Budget (OMB) and the Congressional Budget Office (CBO) independently estimate the amount of the federal budget deficit for the upcoming fiscal year. If that deficit exceeds the maximum targeted deficit amount for that fiscal year by more than a specified amount, the Directors of OMB and CBO independently calculate, on a program-by-program basis, the budget reductions necessary to ensure that the deficit does not exceed the maximum deficit amount. The Act then requires the Directors to report jointly their deficit estimates and budget reduction calculations to the Comptroller General.

The Comptroller General, after reviewing the Directors' reports, then reports his conclusions to the President. § 251(b). The President in turn must issue a "sequestration" order mandating the spending reductions specified by the Comptroller General. § 252. There follows a period during which Congress may by legislation reduce spending to obviate, in whole or in part, the need for the sequestration order. If such reductions are not enacted, the sequestration order becomes effective and the spending reductions included in that order are made.

Anticipating constitutional challenge to these procedures, the Act also contains a "fallback" deficit reduction process to take effect "[i]n the event that any of the reporting procedures described in section 251 are invalidated." § 274(f). Under these provisions, the report prepared by the Directors of OMB and the CBO is submitted directly to a specially

created Temporary Joint Committee on Deficit Reduction, which must report in five days to both Houses a joint resolution setting forth the content of the Directors' report. Congress then must vote on the resolution under special rules, which render amendments out of order. If the resolution is passed and signed by the President, it then serves as the basis for a Presidential sequestration order.

B

Within hours of the President's signing of the Act,[1] Congressman Synar, who had voted against the Act, filed a complaint seeking declaratory relief that the Act was unconstitutional. Eleven other Members later joined Congressman Synar's suit. A virtually identical lawsuit was also filed by the National Treasury Employees Union. The Union alleged that its members had been injured as a result of the Act's automatic spending reduction provisions, which have suspended certain cost-of-living benefit increases to the Union's members.[2]

A three-judge District Court, appointed pursuant to 2 U. S. C. § 922(a)(5) (1982 ed., Supp. III), invalidated the reporting provisions. *Synar* v. *United States*, 626 F. Supp. 1374 (DC 1986) (Scalia, Johnson, and Gasch, JJ.). The District Court concluded that the Union had standing to challenge the Act since the members of the Union had suffered actual injury by suspension of certain benefit increases. The District Court also concluded that Congressman Synar and his fellow Members had standing under the so-called "congressional standing" doctrine. See *Barnes* v. *Kline*, 245 U. S. App. D. C. 1, 21, 759 F. 2d 21, 41 (1985), cert. granted *sub nom. Burke* v. *Barnes*, 475 U. S. 1044 (1986).

---

[1] In his signing statement, the President expressed his view that the Act was constitutionally defective because of the Comptroller General's ability to exercise supervisory authority over the President. Statement on Signing H. J. Res. 372 Into Law, 21 Weekly Comp. of Pres. Doc. 1491 (1985).

[2] An individual member of the Union was later added as a plaintiff. See 475 U. S. 1094 (1986).

The District Court next rejected appellees' challenge that the Act violated the delegation doctrine. The court expressed no doubt that the Act delegated broad authority, but delegation of similarly broad authority has been upheld in past cases. The District Court observed that in *Yakus* v. *United States*, 321 U. S. 414, 420 (1944), this Court upheld a statute that delegated to an unelected "Price Administrator" the power "to promulgate regulations fixing prices of commodities." Moreover, in the District Court's view, the Act adequately confined the exercise of administrative discretion. The District Court concluded that "the totality of the Act's standards, definitions, context, and reference to past administrative practice provides an adequate 'intelligible principle' to guide and confine administrative decisionmaking." 626 F. Supp., at 1389.

Although the District Court concluded that the Act survived a delegation doctrine challenge, it held that the role of the Comptroller General in the deficit reduction process violated the constitutionally imposed separation of powers. The court first explained that the Comptroller General exercises executive functions under the Act. However, the Comptroller General, while appointed by the President with the advice and consent of the Senate, is removable not by the President but only by a joint resolution of Congress or by impeachment. The District Court reasoned that this arrangement could not be sustained under this Court's decisions in *Myers* v. *United States*, 272 U. S. 52 (1926), and *Humphrey's Executor* v. *United States*, 295 U. S. 602 (1935). Under the separation of powers established by the Framers of the Constitution, the court concluded, Congress may not retain the power of removal over an officer performing executive functions. The congressional removal power created a "here-and-now subservience" of the Comptroller General to Congress. 626 F. Supp., at 1392. The District Court therefore held that

"since the powers conferred upon the Comptroller General as part of the automatic deficit reduction process are executive powers, which cannot constitutionally be exercised by an officer removable by Congress, those powers cannot be exercised and therefore the automatic deficit reduction process to which they are are central cannot be implemented." *Id.*, at 1403.

Appeals were taken directly to this Court pursuant to § 274(b) of the Act. We noted probable jurisdiction and expedited consideration of the appeals. 475 U. S. 1009 (1986). We affirm.

## II

A threshold issue is whether the Members of Congress, members of the National Treasury Employees Union, or the Union itself have standing to challenge the constitutionality of the Act in question. It is clear that members of the Union, one of whom is an appellee here, will sustain injury by not receiving a scheduled increase in benefits. See § 252(a)(6)(C)(i); 626 F. Supp., at 1381. This is sufficient to confer standing under § 274(a)(2) and Article III. We therefore need not consider the standing issue as to the Union or Members of Congress. See *Secretary of Interior* v. *California*, 464 U. S. 312, 319, n. 3 (1984). Cf. *Automobile Workers* v. *Brock*, 477 U. S. 274 (1986); *Barnes* v. *Kline*, *supra*. Accordingly, we turn to the merits of the case.

## III

We noted recently that "[t]he Constitution sought to divide the delegated powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial." *INS* v. *Chadha*, 462 U. S. 919, 951 (1983). The declared purpose of separating and dividing the powers of government, of course, was to "diffus[e] power the better to secure liberty." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 635 (1952) (Jackson, J., concurring). Justice Jackson's words echo the famous warning of Montesquieu,

quoted by James Madison in The Federalist No. 47, that " 'there can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates' . . . ." The Federalist No. 47, p. 325 (J. Cooke ed. 1961).

Even a cursory examination of the Constitution reveals the influence of Montesquieu's thesis that checks and balances were the foundation of a structure of government that would protect liberty. The Framers provided a vigorous Legislative Branch and a separate and wholly independent Executive Branch, with each branch responsible ultimately to the people. The Framers also provided for a Judicial Branch equally independent with "[t]he judicial Power . . . extend[ing] to all Cases, in Law and Equity, arising under this Constitution, and the Laws of the United States." Art. III, §2.

Other, more subtle, examples of separated powers are evident as well. Unlike parliamentary systems such as that of Great Britain, no person who is an officer of the United States may serve as a Member of the Congress. Art. I, §6. Moreover, unlike parliamentary systems, the President, under Article II, is responsible not to the Congress but to the people, subject only to impeachment proceedings which are exercised by the two Houses as representatives of the people. Art. II, §4. And even in the impeachment of a President the presiding officer of the ultimate tribunal is not a member of the Legislative Branch, but the Chief Justice of the United States. Art. I, §3.

That this system of division and separation of powers produces conflicts, confusion, and discordance at times is inherent, but it was deliberately so structured to assure full, vigorous, and open debate on the great issues affecting the people and to provide avenues for the operation of checks on the exercise of governmental power.

The Constitution does not contemplate an active role for Congress in the supervision of officers charged with the execution of the laws it enacts. The President appoints "Officers of the United States" with the "Advice and Consent of

the Senate . . . ." Art. II, §2. Once the appointment has been made and confirmed, however, the Constitution explicitly provides for removal of Officers of the United States by Congress only upon impeachment by the House of Representatives and conviction by the Senate. An impeachment by the House and trial by the Senate can rest only on "Treason, Bribery or other high Crimes and Misdemeanors." Art. II, §4. A direct congressional role in the removal of officers charged with the execution of the laws beyond this limited one is inconsistent with separation of powers.

This was made clear in debate in the First Congress in 1789. When Congress considered an amendment to a bill establishing the Department of Foreign Affairs, the debate centered around whether the Congress "should recognize and declare the power of the President under the Constitution to remove the Secretary of Foreign Affairs without the advice and consent of the Senate." *Myers*, 272 U. S., at 114. James Madison urged rejection of a congressional role in the removal of Executive Branch officers, other than by impeachment, saying in debate:

> "Perhaps there was no argument urged with more success, or more plausibly grounded against the Constitution, under which we are now deliberating, than that founded on the mingling of the Executive and Legislative branches of the Government in one body. It has been objected, that the Senate have too much of the Executive power even, by having a control over the President in the appointment to office. Now, shall we extend this connexion between the Legislative and Executive departments, which will strengthen the objection, and diminish the responsibility we have in the head of the Executive?" 1 Annals of Cong. 380 (1789).

Madison's position ultimately prevailed, and a congressional role in the removal process was rejected. This "Decision of 1789" provides "contemporaneous and weighty evidence" of the Constitution's meaning since many of the Members of the

First Congress "had taken part in framing that instrument." *Marsh* v. *Chambers*, 463 U. S. 783, 790 (1983).[3]

. This Court first directly addressed this issue in *Myers* v. *United States*, 272 U. S. 52 (1925). At issue in *Myers* was a statute providing that certain postmasters could be removed only "by and with the advice and consent of the Senate." The President removed one such Postmaster without Senate approval, and a lawsuit ensued. Chief Justice Taft, writing for the Court, declared the statute unconstitutional on the ground that for Congress to "draw to itself, or to either branch of it, the power to remove or the right to participate in the exercise of that power . . . would be . . . to infringe the constitutional principle of the separation of governmental powers." *Id.*, at 161.

A decade later, in *Humphrey's Executor* v. *United States*, 295 U. S. 602 (1935), relied upon heavily by appellants, a Federal Trade Commissioner who had been removed by the President sought backpay. *Humphrey's Executor* involved an issue not presented either in the *Myers* case or in this case—*i. e.*, the power of Congress to limit the President's powers of removal of a Federal Trade Commissioner. 295

---

[3] The First Congress included 20 Members who had been delegates to the Philadelphia Convention:

### IN THE SENATE

| | |
|---|---|
| Richard Bassett (Delaware) | Rufus King (New York) |
| Pierce Butler (South Carolina) | John Langdon (New Hampshire) |
| Oliver Ellsworth (Connecticut) | Robert Morris (Pennsylvania) |
| William Few (Georgia) | William Paterson (New Jersey) |
| William Samuel Johnson | George Read (Delaware) |
| (Connecticut) | Caleb Strong (Massachusetts) |

### IN THE HOUSE

| | |
|---|---|
| Abraham Baldwin (Georgia) | Nicholas Gilman (New Hampshire) |
| Daniel Carroll (Maryland) | James Madison (Virginia) |
| George Clymer (Pennsylvania) | Roger Sherman (Connecticut) |
| Thomas FitzSimons (Pennsylvania) | Hugh Williamson (North Carolina) |
| Elbridge Gerry (Massachusetts) | |

U. S., at 630.[4] The relevant statute permitted removal "by the President," but only "for inefficiency, neglect of duty, or malfeasance in office." Justice Sutherland, speaking for the Court, upheld the statute, holding that "illimitable power of removal is not possessed by the President [with respect to Federal Trade Commissioners]." *Id.*, at 628–629. The Court distinguished *Myers*, reaffirming its holding that congressional participation in the removal of executive officers is unconstitutional. Justice Sutherland's opinion for the Court also underscored the crucial role of separated powers in our system:

> "The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question. So much is implied in the very fact of the separation of the powers of these departments by the Constitution; and in the rule which recognizes their essential co-equality." 295 U. S., at 629–630.

The Court reached a similar result in *Wiener* v. *United States*, 357 U. S. 349 (1958), concluding that, under *Humphrey's Executor*, the President did not have unrestrained

---

[4] Appellants therefore are wide of the mark in arguing that an affirmance in this case requires casting doubt on the status of "independent" agencies because no issues involving such agencies are presented here. The statutes establishing independent agencies typically specify either that the agency members are removable by the President for specified causes, see, *e. g.*, 15 U. S. C. § 41 (members of the Federal Trade Commission may be removed by the President "for inefficiency, neglect of duty, or malfeasance in office"), or else do not specify a removal procedure, see, *e. g.*, 2 U. S. C. § 437c (Federal Election Commission). This case involves nothing like these statutes, but rather a statute that provides for direct congressional involvement over the decision to remove the Comptroller General. Appellants have referred us to no independent agency whose members are removable by the Congress for certain causes short of impeachable offenses, as is the Comptroller General, see Part IV, *infra*.

removal authority over a member of the War Claims Commission.

In light of these precedents, we conclude that Congress cannot reserve for itself the power of removal of an officer charged with the execution of the laws except by impeachment. To permit the execution of the laws to be vested in an officer answerable only to Congress would, in practical terms, reserve in Congress control over the execution of the laws. As the District Court observed: "Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey." 626 F. Supp., at 1401. The structure of the Constitution does not permit Congress to execute the laws; it follows that Congress cannot grant to an officer under its control what it does not possess.

Our decision in *INS* v. *Chadha*, 462 U. S. 919 (1983), supports this conclusion. In *Chadha*, we struck down a one-House "legislative veto" provision by which each House of Congress retained the power to reverse a decision Congress had expressly authorized the Attorney General to make:

> "Disagreement with the Attorney General's decision on Chadha's deportation—that is, Congress' decision to deport Chadha—no less than Congress' original choice to delegate to the Attorney General the authority to make that decision, involves determinations of policy that Congress can implement in only one way; bicameral passage followed by presentment to the President. Congress must abide by its delegation of authority until that delegation is legislatively altered or revoked." *Id.*, at 954–955.

To permit an officer controlled by Congress to execute the laws would be, in essence, to permit a congressional veto. Congress could simply remove, or threaten to remove, an officer for executing the laws in any fashion found to be unsatisfactory to Congress. This kind of congressional control over

the execution of the laws, *Chadha* makes clear, is constitutionally impermissible.

The dangers of congressional usurpation of Executive Branch functions have long been recognized. "[T]he debates of the Constitutional Convention, and the Federalist Papers, are replete with expressions of fear that the Legislative Branch of the National Government will aggrandize itself at the expense of the other two branches." *Buckley* v. *Valeo*, 424 U. S. 1, 129 (1976). Indeed, we also have observed only recently that "[t]he hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted." *Chadha, supra,* at 951. With these principles in mind, we turn to consideration of whether the Comptroller General is controlled by Congress.

## IV

Appellants urge that the Comptroller General performs his duties independently and is not subservient to Congress. We agree with the District Court that this contention does not bear close scrutiny.

The critical factor lies in the provisions of the statute defining the Comptroller General's office relating to removability.[5] Although the Comptroller General is nominated by the President from a list of three individuals recommended by the Speaker of the House of Representatives and the President *pro tempore* of the Senate, see 31 U. S. C.

---

[5] We reject appellants' argument that consideration of the effect of a removal provision is not "ripe" until that provision is actually used. As the District Court concluded, "it is the Comptroller General's presumed desire to avoid removal by pleasing Congress, which creates the here-and-now subservience to another branch that raises separation-of-powers problems." *Synar* v. *United States*, 626 F. Supp. 1374, 1392 (DC 1986). The Impeachment Clause of the Constitution can hardly be thought to be undermined because of nonuse.

§ 703(a)(2),[6] and confirmed by the Senate, he is removable only at the initiative of Congress. He may be removed not only by impeachment but also by joint resolution of Congress "at any time" resting on any one of the following bases:

"(i) permanent disability;
"(ii) inefficiency;
"(iii) neglect of duty;
"(iv) malfeasance; or
"(v) a felony or conduct involving moral turpitude."

31 U. S. C. § 703(e)(1)B.[7]

This provision was included, as one Congressman explained in urging passage of the Act, because Congress "felt that [the Comptroller General] should be brought under the sole control of Congress, so that Congress at any moment when it found he was inefficient and was not carrying on the duties of his office as he should and as the Congress expected, could remove him without the long, tedious process of a trial by impeachment." 61 Cong. Rec. 1081 (1921).

The removal provision was an important part of the legislative scheme, as a number of Congressmen recognized. Representative Hawley commented: "[H]e is our officer, in a measure, getting information for us . . . . If he does not do his work properly, we, as practically his employers, ought to be able to discharge him from his office." 58 Cong. Rec. 7136 (1919). Representative Sisson observed that the removal provisions would give "[t]he Congress of the United States . . . absolute control of the man's destiny in office."

---

[6] Congress adopted this provision in 1980 because of "the special interest of both Houses in the choice of an individual whose primary function is to provide assistance to Congress." S. Rep. No. 96–570, p. 10.

[7] Although the President could veto such a joint resolution, the veto could be overridden by a two-thirds vote of both Houses of Congress. Thus, the Comptroller General could be removed in the face of Presidential opposition. Like the District Court, 626 F. Supp., at 1393, n. 21, we therefore read the removal provision as authorizing removal by Congress alone.

61 Cong. Rec. 987 (1921). The ultimate design was to "give the legislative branch of the Government control of the audit, not through the power of appointment, but through the power of removal." 58 Cong. Rec. 7211 (1919) (Rep. Temple).

JUSTICE WHITE contends: "The statute does not permit anyone to remove the Comptroller at will; removal is permitted only for specified cause, with the existence of cause to be determined by Congress following a hearing. Any removal under the statute would presumably be subject to post-termination judicial review to ensure that a hearing had in fact been held and that the finding of cause for removal was not arbitrary." *Post*, at 770. That observation by the dissenter rests on at least two arguable premises: (a) that the enumeration of certain specified causes of removal excludes the possibility of removal for other causes, cf. *Shurtleff* v. *United States*, 189 U. S. 311, 315–316 (1903); and (b) that any removal would be subject to judicial review, a position that appellants were unwilling to endorse.[8]

Glossing over these difficulties, the dissent's assessment of the statute fails to recognize the breadth of the grounds for removal. The statute permits removal for "inefficiency," "neglect of duty," or "malfeasance." These terms are very broad and, as interpreted by Congress, could sustain removal of a Comptroller General for any number of actual or perceived transgressions of the legislative will. The Constitutional Convention chose to permit impeachment of executive officers only for "Treason, Bribery, or other high Crimes and Misdemeanors." It rejected language that would have permitted impeachment for "maladministration," with Madison

---

[8] The dissent relies on *Humphrey's Executor* v. *United States*, 295 U. S. 602 (1935), as its only Court authority for this point, but the President did not assert that he had removed the Federal Trade Commissioner in compliance with one of the enumerated statutory causes for removal. See *id.*, at 612 (argument of Solicitor General Reed); see also *Synar* v. *United States*, 626 F. Supp., at 1398.

arguing that "[s]o vague a term will be equivalent to a tenure during pleasure of the Senate." 2 M. Farrand, Records of the Federal Convention of 1787, p. 550 (1911).

We need not decide whether "inefficiency" or "malfeasance" are terms as broad as "maladministration" in order to reject the dissent's position that removing the Comptroller General requires "a feat of bipartisanship more difficult than that required to impeach and convict." *Post*, at 771 (WHITE, J., dissenting). Surely no one would seriously suggest that judicial independence would be strengthened by allowing removal of federal judges only by a joint resolution finding "inefficiency," "neglect of duty," or "malfeasance."

JUSTICE WHITE, however, assures us that "[r]ealistic consideration" of the "practical result of the removal provision," *post*, at 774, 773, reveals that the Comptroller General is unlikely to be removed by Congress. The separated powers of our Government cannot be permitted to turn on judicial assessment of whether an officer exercising executive power is on good terms with Congress. The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty. In constitutional terms, the removal powers over the Comptroller General's office dictate that he will be subservient to Congress.

This much said, we must also add that the dissent is simply in error to suggest that the political realities reveal that the Comptroller General is free from influence by Congress. The Comptroller General heads the General Accounting Office (GAO), "an instrumentality of the United States Government independent of the executive departments," 31 U. S. C. § 702(a), which was created by Congress in 1921 as part of the Budget and Accounting Act of 1921, 42 Stat. 23. Congress created the office because it believed that it "needed an officer, responsible to it alone, to check upon the application of public funds in accordance with appropriations." H. Mans-

field, The Comptroller General: A Study in the Law and Practice of Financial Administration 65 (1939).

It is clear that Congress has consistently viewed the Comptroller General as an officer of the Legislative Branch. The Reorganization Acts of 1945 and 1949, for example, both stated that the Comptroller General and the GAO are "a part of the legislative branch of the Government." 59 Stat. 616; 63 Stat. 205. Similarly, in the Accounting and Auditing Act of 1950, Congress required the Comptroller General to conduct audits "as an agent of the Congress." 64 Stat. 835.

Over the years, the Comptrollers General have also viewed themselves as part of the Legislative Branch. In one of the early Annual Reports of Comptroller General, the official seal of his office was described as reflecting

> "the independence of judgment to be exercised by the General Accounting Office, subject to the control of the legislative branch. . . . The combination represents an agency of the Congress independent of other authority auditing and checking the expenditures of the Government as required by law and subjecting any questions arising in that connection to quasi-judicial determination." GAO Ann. Rep. 5–6 (1924).

Later, Comptroller General Warren, who had been a Member of Congress for 15 years before being appointed Comptroller General, testified: "During most of my public life, . . . I have been a member of the legislative branch. Even now, although heading a great agency, it is an agency of the Congress, and *I am an agent of the Congress.*" To Provide for Reorganizing of Agencies of the Government: Hearings on H. R. 3325 before the House Committee on Expenditures, 79th Cong., 1st Sess., 69 (1945) (emphasis added). And, in one conflict during Comptroller General McCarl's tenure, he asserted his independence of the Executive Branch, stating:

> "Congress . . . is . . . the only authority to which there lies an appeal from the decision of this office. . . .

". . . I may not accept the opinion of any official, inclusive of the Attorney General, as controlling my duty under the law." 2 Comp. Gen. 784, 786–787 (1923) (disregarding conclusion of the Attorney General, 33 Op. Atty. Gen. 476 (1923), with respect to interpretation of compensation statute).

Against this background, we see no escape from the conclusion that, because Congress has retained removal authority over the Comptroller General, he may not be entrusted with executive powers. The remaining question is whether the Comptroller General has been assigned such powers in the Balanced Budget and Emergency Deficit Control Act of 1985.

## V

The primary responsibility of the Comptroller General under the instant Act is the preparation of a "report." This report must contain detailed estimates of projected federal revenues and expenditures. The report must also specify the reductions, if any, necessary to reduce the deficit to the target for the appropriate fiscal year. The reductions must be set forth on a program-by-program basis.

In preparing the report, the Comptroller General is to have "due regard" for the estimates and reductions set forth in a joint report submitted to him by the Director of CBO and the Director of OMB, the President's fiscal and budgetary adviser. However, the Act plainly contemplates that the Comptroller General will exercise his independent judgment and evaluation with respect to those estimates. The Act also provides that the Comptroller General's report "shall explain fully any differences between the contents of such report and the report of the Directors." § 251(b)(2).

Appellants suggest that the duties assigned to the Comptroller General in the Act are essentially ministerial and mechanical so that their performance does not constitute "execution of the law" in a meaningful sense. On the contrary, we view these functions as plainly entailing execution

of the law in constitutional terms. Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of "execution" of the law. Under § 251, the Comptroller General must exercise judgment concerning facts that affect the application of the Act. He must also interpret the provisions of the Act to determine precisely what budgetary calculations are required. Decisions of that kind are typically made by officers charged with executing a statute.

The executive nature of the Comptroller General's functions under the Act is revealed in § 252(a)(3) which gives the Comptroller General the ultimate authority to determine the budget cuts to be made. Indeed, the Comptroller General commands the President himself to carry out, without the slightest variation (with exceptions not relevant to the constitutional issues presented), the directive of the Comptroller General as to the budget reductions:

> "The [Presidential] order *must provide* for reductions in the manner specified in section 251(a)(3), *must incorporate* the provisions of the [Comptroller General's] report submitted under section 251(b), and *must be consistent with such report in all respects.* The President *may not modify or recalculate any of the estimates, determinations, specifications, bases, amounts, or percentages* set forth in the report submitted under section 251(b) in determining the reductions to be specified in the order with respect to programs, projects, and activities, or with respect to budget activities, within an account . . . ." § 252(a)(3) (emphasis added).

See also § 251(d)(3)(A).

Congress of course initially determined the content of the Balanced Budget and Emergency Deficit Control Act; and undoubtedly the content of the Act determines the nature of the executive duty. However, as *Chadha* makes clear, once Congress makes its choice in enacting legislation, its participation ends. Congress can thereafter control the execution

of its enactment only indirectly—by passing new legislation. *Chadha*, 462 U. S., at 958. By placing the responsibility for execution of the Balanced Budget and Emergency Deficit Control Act in the hands of an officer who is subject to removal only by itself, Congress in effect has retained control over the execution of the Act and has intruded into the executive function. The Constitution does not permit such intrusion.

## VI

We now turn to the final issue of remedy. Appellants urge that rather than striking down § 251 and invalidating the significant power Congress vested in the Comptroller General to meet a national fiscal emergency, we should take the lesser course of nullifying the statutory provisions of the 1921 Act that authorizes Congress to remove the Comptroller General. At oral argument, counsel for the Comptroller General suggested that this might make the Comptroller General removable by the President. All appellants urge that Congress would prefer invalidation of the removal provisions rather than invalidation of § 251 of the Balanced Budget and Emergency Deficit Control Act.

Severance at this late date of the removal provisions enacted 65 years ago would significantly alter the Comptroller General's office, possibly by making him subservient to the Executive Branch. Recasting the Comptroller General as an officer of the Executive Branch would accordingly alter the balance that Congress had in mind in drafting the Budget and Accounting Act of 1921 and the Balanced Budget and Emergency Deficit Control Act, to say nothing of the wide array of other tasks and duties Congress has assigned the Comptroller General in other statutes.[9] Thus appellants'

---

[9] Since 1921, the Comptroller General has been assigned a variety of functions. See, *e. g.*, 2 U. S. C. § 687 (1982 ed., Supp. III) (duty to bring suit to require release of impounded budget authority); 42 U. S. C. § 6384(a) (duty to impose civil penalties under the Energy Policy and Conservation Act of 1975); 15 U. S. C. § 1862 (member of Chrysler Corporation

argument would require this Court to undertake a weighing of the importance Congress attached to the removal provisions in the Budget and Accounting Act of 1921 as well as in other subsequent enactments against the importance it placed on the Balanced Budget and Emergency Deficit Control Act of 1985.

Fortunately this is a thicket we need not enter. The language of the Balanced Budget and Emergency Deficit Control Act itself settles the issue. In § 274(f), Congress has explicitly provided "fallback" provisions in the Act that take effect "[i]n the event . . . *any* of the reporting procedures described in section 251 are invalidated." § 274(f)(1) (emphasis added). The fallback provisions are "'fully operative as a law,'" *Buckley* v. *Valeo*, 424 U. S., at 108 (quoting *Champlin Refining Co.* v. *Corporation Comm'n of Oklahoma*, 286 U. S. 210, 234 (1932)). Assuming that appellants are correct in urging that this matter must be resolved on the basis of congressional intent, the intent appears to have been for § 274(f) to be given effect in this situation. Indeed, striking the removal provisions would lead to a statute that Congress would probably have refused to adopt. As the District Court concluded:

> "[T]he grant of authority to the Comptroller General was a carefully considered protection against what the House conceived to be the pro-executive bias of the OMB. It is doubtful that the automatic deficit reduction process would have passed without such protection, and doubtful that the protection would have been considered present if the Comptroller General were not removable by Congress itself . . . ." 626 F. Supp., at 1394.

---

Loan Guarantee Board); 45 U. S. C. § 711(d)(1)(C) (member of Board of Directors of United States Railway Association); 31 U. S. C. §§ 3551–3556 (1982 ed., Supp. III) (authority to consider bid protests under Competition in Contracting Act of 1984).

Accordingly, rather than perform the type of creative and imaginative statutory surgery urged by appellants, our holding simply permits the fallback provisions to come into play.[10]

## VII

No one can doubt that Congress and the President are confronted with fiscal and economic problems of unprecedented magnitude, but "the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution. Convenience and efficiency are not the primary objectives — or the hallmarks — of democratic government . . . ." *Chadha, supra,* at 944.

We conclude that the District Court correctly held that the powers vested in the Comptroller General under § 251 violate the command of the Constitution that the Congress play no direct role in the execution of the laws. Accordingly, the judgment and order of the District Court are affirmed.

Our judgment is stayed for a period not to exceed 60 days to permit Congress to implement the fallback provisions.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE MARSHALL joins, concurring in the judgment.

When this Court is asked to invalidate a statutory provision that has been approved by both Houses of the Congress and signed by the President, particularly an Act of Congress that confronts a deeply vexing national problem, it should only do so for the most compelling constitutional reasons. I

---

[10] Because we conclude that the Comptroller General, as an officer removable by Congress, may not exercise the powers conferred upon him by the Act, we have no occasion for considering appellees' other challenges to the Act, including their argument that the assignment of powers to the Comptroller General in § 251 violates the delegation doctrine, see, *e. g., A. L. A. Schechter Poultry Corp.* v. *United States,* 295 U. S. 495 (1935); *Yakus* v. *United States,* 321 U. S. 414 (1944).

agree with the Court that the "Gramm-Rudman-Hollings" Act contains a constitutional infirmity so severe that the flawed provision may not stand. I disagree with the Court, however, on the reasons why the Constitution prohibits the Comptroller General from exercising the powers assigned to him by § 251(b) and § 251(c)(2) of the Act. It is not the dormant, carefully circumscribed congressional removal power that represents the primary constitutional evil. Nor do I agree with the conclusion of both the majority and the dissent that the analysis depends on a labeling of the functions assigned to the Comptroller General as "executive powers." *Ante,* at 732–734; *post,* at 764–765. Rather, I am convinced that the Comptroller General must be characterized as an agent of Congress because of his longstanding statutory responsibilities; that the powers assigned to him under the Gramm-Rudman-Hollings Act require him to make policy that will bind the Nation; and that, when Congress, or a component or an agent of Congress, seeks to make policy that will bind the Nation, it must follow the procedures mandated by Article I of the Constitution—through passage by both Houses and presentment to the President. In short, Congress may not exercise its fundamental power to formulate national policy by delegating that power to one of its two Houses, to a legislative committee, or to an individual agent of the Congress such as the Speaker of the House of Representatives, the Sergeant at Arms of the Senate, or the Director of the Congressional Budget Office. *INS* v. *Chadha,* 462 U. S. 919 (1983). That principle, I believe, is applicable to the Comptroller General.

I

The fact that Congress retained for itself the power to remove the Comptroller General is important evidence supporting the conclusion that he is a member of the Legislative Branch of the Government. Unlike the Court, however, I am not persuaded that the congressional removal power is either a necessary, or a sufficient, basis for concluding that his statutory assignment is invalid.

738

As JUSTICE WHITE explains, *post*, at 770–771, Congress does not have the power to remove the Comptroller General at will, or because of disagreement with any policy determination that he may be required to make in the administration of this, or any other, Act. The statute provides a term of 15 years for the Comptroller General; it further provides that he must retire upon becoming 70 years of age, and that he may be removed at any time by impeachment or by "joint resolution of Congress, after notice and an opportunity for a hearing, only for—(i) permanent disability; (ii) inefficiency; (iii) neglect of duty; (iv) malfeasance; or (v) a felony or conduct involving moral turpitude." 31 U. S. C. § 703(e)(1)(B). Far from assuming that this provision creates a "'here-and-now subservience'" respecting all of the Comptroller General's actions, *ante*, at 727, n. 5 (quoting District Court), we should presume that Congress will adhere to the law—that it would only exercise its removal powers if the Comptroller General were found to be permanently disabled, inefficient, neglectful, or culpable of malfeasance, a felony, or conduct involving moral turpitude.[1]

---

[1] Just as it is "always appropriate to assume that our elected representatives, like other citizens, know the law," *Cannon* v. *University of Chicago*, 441 U. S. 677, 696–697 (1979), so too is it appropriate to assume that our elected representatives, like other citizens, will respect the law. As the proceedings in the United States Senate resulting from the impeachment of Justice Chase demonstrate, moreover, if that body were willing to give only lipservice to the governing standard, political considerations rather than "good behavior" would determine the tenure of federal judges. See M. Elsmere, The Impeachment Trial of Justice Samuel Chase 205 (1962); 3 A. Beveridge, The Life of John Marshall 157–223 (1919). See also W. Wilson, Congressional Government: A Study in American Politics 186–187 (Meridian Books ed., 1956) (quoted in Levi, Some Aspects of Separation of Powers, 76 Colum. L. Rev. 369, 380 (1976)):

" 'If there be one principle clearer than another, it is this: that in any business, whether of government or of mere merchandising, *somebody must be trusted*, in order that when things go wrong it may be quite plain who should be punished. . . . *Power and strict accountability of its use* are the essential constituents of good government.' " (Emphasis in original.)

The notion that the removal power at issue here automatically creates some kind of "here-and-now subservience" of the Comptroller General to Congress is belied by history. There is no evidence that Congress has ever removed, or threatened to remove, the Comptroller General for reasons of policy. Moreover, the President has long possessed a comparable power to remove members of the Federal Trade Commission, yet it is universally accepted that they are independent of, rather than subservient to, the President in performing their official duties. Thus, the statute that the Court construed in *Humphrey's Executor* v. *United States*, 295 U. S. 602 (1935), provided:

> "Any commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office." 38 Stat. 718.

In upholding the congressional limitations on the President's power of removal, the Court stressed the independence of the Commission from the President.[2] There was no suggestion that the retained Presidential removal powers—similar to those at issue here—created a subservience to the President.[3]

---

[2] See *Humphrey's Executor*, 295 U. S., at 625–626 (describing congressional intention to create "a body which shall be independent of executive authority, *except in its selection*, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government") (emphasis in original).

[3] The manner in which President Franklin Roosevelt exercised his removal power further underscores the propriety of presuming that Congress, and the President, will not use statutorily prescribed removal causes as pretexts for other removal reasons. President Roosevelt never claimed that his removal of Humphrey was for one of the statutorily prescribed reasons—inefficiency, neglect of duty, or malfeasance in office. The President's removal letter merely stated:

" 'Effective as of this date you are hereby removed from the office of Commissioner of the Federal Trade Commission.' " See *id.*, at 619.

Previously, the President had written to Commissioner Humphrey stating:

To be sure, there may be a significant separation-of-powers difference between the President's *exercise* of carefully circumscribed removal authority and Congress' *exercise* of identically circumscribed removal authority. But the *Humphrey's Executor* analysis at least demonstrates that it is entirely proper for Congress to specify the qualifications for an office that it has created, and that the prescription of what might be termed "dereliction-of-duty" removal standards does not itself impair the independence of the official subject to such standards.[4]

The fact that Congress retained for itself the power to remove the Comptroller General thus is not necessarily an adequate reason for concluding that his role in the Gramm-Rudman-Hollings budget reduction process is unconstitutional. It is, however, a fact that lends support to my ulti-

---

" 'You will, I know, realize that I do not feel that your mind and my mind go along together on either the policies or the administering of the Federal Trade Commission, and, frankly, I think it is best for the people of this country that I should have a full confidence.' " *Ibid.*

[4] Indeed, even in *Myers* v. *United States*, 272 U. S. 52 (1926), in its challenge to the provision requiring Senate approval of the removal of a postmaster, the Federal Government assumed that Congress had power to limit the terms of removal to reasons that relate to the office. Solicitor General Beck recognized "that the power of removal may be subject to such general laws as do not destroy the exercise by the President of his power of removal, and which leaves to him the exercise of the power subject to such general laws as may fairly measure the standard of public service." Substitute Brief for United States on Reargument in No. 2, O. T. 1926, p. 9. At oral argument, the Solicitor General explained his position:

"Mr. BECK. . . . Suppose the Congress creates an office and says that it shall only be filled by a man learned in the law; and suppose it further provides that, if a man ceases to be member of the bar, he shall be removed. I am not prepared to say that such a law can not be reconciled with the Constitution. What I do say is that, when the condition imposed upon the creation of the office has no reasonable relation to the office; when it is not a legislative standard to be applied by the President, and is not the declaration of qualifications, but is the creation of an appointing power other than the President, then Congress has crossed the dead line, for it has usurped the prerogative of the President." 272 U. S., at 96–97.

mate conclusion that, in exercising his functions under this Act, he serves as an agent of the Congress.

## II

In assessing the role of the Comptroller General, it is appropriate to consider his already existing statutory responsibilities. Those responsibilities leave little doubt that one of the identifying characteristics of the Comptroller General is his statutorily required relationship to the Legislative Branch.

In the statutory section that identifies the Comptroller General's responsibilities for investigating the use of public money, four of the five enumerated duties specifically describe an obligation owed to Congress. The first is the only one that does not expressly refer to Congress: The Comptroller General shall "investigate all matters related to the receipt, disbursement, and use of public money." 31 U. S. C. § 712(1). The other four clearly require the Comptroller General to work with Congress' specific needs as his legal duty. Thus, the Comptroller General must "estimate the cost to the United States Government of complying with each restriction on expenditures of a specific appropriation in a general appropriation law *and report each estimate to Congress with recommendations* the Comptroller General considers desirable." § 712(2) (emphasis added). He must "analyze expenditures of each executive agency the Comptroller General believes *will help Congress decide* whether public money has been used and expended economically and efficiently." § 712(3) (emphasis added). He must "make an investigation and report *ordered by either House of Congress or a committee of Congress* having jurisdiction over revenue, appropriations, or expenditures." § 712(4) (emphasis added). Finally, he must "give *a committee of Congress* having jurisdiction over revenue, appropriations, or expenditures the help and information the committee requests." § 712(5) (emphasis added).

The statutory provision detailing the Comptroller General's role in evaluating programs and activities of the United States Government similarly leaves no doubt regarding the beneficiary of the Comptroller General's labors. The Comptroller General may undertake such an evaluation for one of three specified reasons: (1) on his own initiative; (2) "when either House of Congress orders an evaluation"; or (3) "when a committee of Congress with jurisdiction over the program or activity requests the evaluation." 31 U. S. C. § 717(b). In assessing a program or activity, moreover, the Comptroller General's responsibility is to "develop and recommend *to Congress* ways to evaluate a program or activity the Government carries out under existing law." § 717(c) (emphasis added).

The Comptroller General's responsibilities are repeatedly framed in terms of his specific obligations to Congress. Thus, one provision specifies in some detail the obligations of the Comptroller General with respect to an individual committee's request for a program evaluation:

> "On request of a committee of Congress, the Comptroller General shall help the committee to—
>
> "(A) develop a statement of legislative goals and ways to assess and report program performance related to the goals, including recommended ways to assess performance, information to be reported, responsibility for reporting, frequency of reports, and feasibility of pilot testing; and
>
> "(B) assess program evaluations prepared by and for an agency." § 717(d)(1).

Similarly, another provision requires that, on "request of a member of Congress, the Comptroller General shall give the member a copy of the material the Comptroller General compiles in carrying out this subsection that has been released by the committee for which the material was compiled." § 717(d)(2).

Numerous other provisions strongly support the conclusion that one of the Comptroller General's primary responsibilities is to work specifically on behalf of Congress. The Comptroller General must make annual reports on specified subjects to Congress, to the Senate Committee on Finance, to the Senate Committee on Governmental Affairs, to the House Committee on Ways and Means, to the House Committee on Government Operations, and to the Joint Committee on Taxation. 31 U. S. C. §§ 719(a),(d). On request of a committee, the Comptroller General "shall explain to and discuss with the committee or committee staff a report the Comptroller General makes that would help the committee — (1) evaluate a program or activity of an agency within the jurisdiction of the committee; or (2) in its consideration of proposed legislation." § 719(i). Indeed, the relationship between the Comptroller General and Congress is so close that the "Comptroller General may assign or detail an officer or employee of the General Accounting Office to full-time continuous duty with a committee of Congress for not more than one year." 31 U. S. C. § 734(a).

The Comptroller General's current statutory responsibilities on behalf of Congress are fully consistent with the historic conception of the Comptroller General's office. The statute that created the Comptroller General's office — the Budget and Accounting Act of 1921 — provided that four of the five statutory responsibilities given to the Comptroller General be exercised on behalf of Congress, three of them exclusively so.[5] On at least three occasions since 1921, more-

---

[5] In pertinent part, the 1921 Act provided:

"SEC. 312(a) The Comptroller General shall investigate, at the seat of government or elsewhere, all matters relating to the receipt, disbursement, and application of public funds, and shall make to the President when requested by him, and *to Congress at the beginning of each regular session,* a report in writing of the work of the General Accounting Office, containing recommendations concerning the legislation he may deem necessary to facilitate the prompt and accurate rendition and settlement of accounts and concerning such other matters relating to the receipt, dis-

over, in considering the structure of Government, Congress has defined the Comptroller General as being a part of the Legislative Branch. In the Reorganization Act of 1945, Congress specified that the Comptroller General and the General Accounting Office "are a part of the legislative branch of the Government." 59 Stat. 616.[6] In the Reorganization Act of 1949, Congress again confirmed that the Comptroller General and the General Accounting Office "are a part of the legislative branch of the Government." 63 Stat. 205.[7] Finally, in the Budget and Accounting Procedures Act of 1950, Congress referred to the "auditing for the Government, con-

---

bursement, and application of public funds as he may think advisable. In such regular report, or in special reports at any time when Congress is in session, he shall make recommendations looking to greater economy or efficiency in public expenditures.

"(b) He shall make such investigations and reports as shall be ordered by *either House of Congress or by any committee of either House having jurisdiction over revenue, appropriations, or expenditures*. The Comptroller General shall also, at the request of any such committee, direct assistants from his office to furnish the committee such aid and information as it may request.

"(c) The Comptroller General shall specifically report *to Congress* every expenditure or contract made by any department or establishment in any year in violation of law.

"(d) He shall submit *to Congress* reports upon the adequacy and effectiveness of the administrative examination of accounts and claims in the respective departments and establishments and upon the adequacy and effectiveness of departmental inspection of the offices and accounts of fiscal officers.

"(e) He shall furnish such information relating to expenditures and accounting to the Bureau of the Budget as it may request from time to time." 42 Stat. 25–26 (emphases added).

[6] See also H. R. Rep. No. 971, 79th Cong., 1st Sess., 12 (1945) ("[T]he Comptroller General of the United States" and "the General Accounting Office . . . are declared by the bill to be a part of the legislative branch of the Government").

[7] See also H. R. Rep. No. 23, 81st Cong., 1st Sess., 11 (1949) ("[T]he Comptroller General of the United States" and "the General Accounting Office . . . (as in the Reorganization Act of 1945) are declared by the bill to be a part of the legislative branch of the Government").

ducted by the Comptroller General of the United States as an agent of the Congress." 64 Stat. 835. Like the already existing statutory responsibilities, then, the history of the Comptroller General statute confirms that the Comptroller General should be viewed as an agent of the Congress.

This is not to say, of course, that the Comptroller General has no obligations to the Executive Branch, or that he is an agent of the Congress in quite so clear a manner as the Doorkeeper of the House. For the current statutory responsibilities also envision a role for the Comptroller General with respect to the Executive Branch. The Comptroller General must "give the President information on expenditures and accounting the President requests." 31 U. S. C. § 719(f). Although the Comptroller General is required to provide Congress with an annual report, he is also required to provide the President with the report if the President so requests. § 719(a). The Comptroller General is statutorily required to audit the Internal Revenue Service and the Bureau of Alcohol, Tobacco, and Firearms (and provide congressional committees with information respecting the audits). § 713. In at least one respect, moreover, the Comptroller General is treated like an executive agency: "To the extent applicable, all laws generally related to administering an agency apply to the Comptroller General." § 704(a). Historically, as well, the Comptroller General has had some relationship to the Executive Branch. As noted, n. 5, *supra*, in the 1921 Act, one of the Comptroller General's specific responsibilities was to provide information to the Bureau of the Budget. In fact, when the Comptroller General's office was created, its functions, personnel, records, and even furniture derived from a previous executive office.[8]

---

[8] See 42 Stat. 23 ("The offices of Comptroller of the Treasury and Assistant Comptroller of the Treasury are abolished, to take effect July 21, 1921. . . . [A]ll books, records, documents, papers, furniture, office equipment and other property of the office of the Comptroller of the Treasury shall become the property of the General Accounting Office").

Thus, the Comptroller General retains certain obligations with respect to the Executive Branch.[9]   Obligations to two branches are not, however, impermissible and the presence of such dual obligations does not prevent the characterization of the official with the dual obligations as part of one branch.[10] It is at least clear that, in most, if not all, of his statutory responsibilities, the Comptroller General is properly characterized as an agent of the Congress.[11]

---

[9] The Comptroller General, of course, is also appointed by the President.   31 U. S. C. § 703(a)(1).   So too, however, are the Librarian of Congress, 2 U. S. C. § 136, the Architect of the Capitol, 40 U. S. C. § 162, and the Public Printer, 44 U. S. C. § 301.

[10] See *Pennsylvania Bureau of Correction* v. *United States Marshals Service*, 474 U. S. 34, 36–37, and n. 1 (1985) (reviewing the Marshals' statutory obligations to the Judiciary and the Executive Branch, but noting that the "Marshals are within the Executive Branch of the Federal Government").   Cf. Report by the Comptroller General, U. S. Marshals' Dilemma: Serving Two Branches of Government 14 (1982) ("It is extremely difficult for one person to effectively serve two masters").   Surely no one would suggest that the fact that THE CHIEF JUSTICE performs executive functions for the Smithsonian Institution, 20 U. S. C. § 42, affects his characterization as a member of the Judicial Branch of the Government. Nor does the performance of similar functions by three Members of the Senate and three Members of the House, *ibid.*, affect their characterization as members of the Legislative Branch of the Government.

[11] Despite the suggestions of the dissents, *post*, at 773, n. 12 (WHITE, J., dissenting); *post*, at 778–779, n. 1 (BLACKMUN, J., dissenting), it is quite obvious that the Comptroller General, and the General Accounting Office, have a fundamentally different relationship with Congress than do independent agencies like the Federal Trade Commission.   Rather than an independent agency, the Comptroller General and the GAO are functionally equivalent to congressional agents such as the Congressional Budget Office, the Office of Technology Assessment, and the Library of Congress' Congressional Research Service.   As the statutory responsibilities make clear, like those congressional agents, the Comptroller General and the GAO function virtually as a permanent staff for Congress.   Indeed, in creating the Congressional Budget Office, Congress explicitly required that the GAO provide extensive services for the CBO—a fact with some significance for this case.   The CBO statute enumerates the three "congressional agencies" that must provide assistance to the CBO—"the General Account-

## III

Everyone agrees that the powers assigned to the Comptroller General by § 251(b) and § 251(c)(2) of the Gramm-Rudman-Hollings Act are extremely important. They require him to exercise sophisticated economic judgment concerning anticipated trends in the Nation's economy, pro-

ing Office, the Library of Congress, and the Office of Technology Assessment." 2 U. S. C. § 601(e). These "congressional agencies" are authorized to provide the CBO with "services, facilities, and personnel with or without reimbursement," *ibid.*, as well as "information, data, estimates, and statistics." *Ibid.* See also Congressional Quarterly's Guide to Congress 555 (3d ed. 1982) ("In addition to their staffs, committees, facilities and privileges, members of Congress are backed by a number of other supporting organizations and activities that keep Capitol Hill running. Among the largest of these in size of staff are the General Accounting Office (GAO), with about 5,200 employees; the Library of Congress' Congressional Research Service (CRS), with 856; the Congressional Budget Office (CBO), with 218; and the Office of Technology Assessment (OTA), with 130. . . . To an extent, each of the four legislative agencies has its own specialized functions. . . . Although each of the four agencies has been given its own task, their jobs overlap to some extent. This has led in some cases to duplication and waste and even to competition among the different groups. . . . The General Accounting Office is an arm of the legislative branch that was created to oversee the expenditures of the executive branch").

Thus, to contend that the Comptroller General's numerous statutory responsibilities to serve Congress directly are somehow like an independent agency's obligations to report to Congress and to implement legislatively mandated standards simply misconceives the actual duties of the Comptroller General and the GAO. It also ignores the clear import of the legislative history of these entities. See, *e. g.*, *Ameron, Inc.* v. *United States Army Corps of Engineers*, 787 F. 2d 875, 892–893 (CA3 1986) (Becker, J., concurring in part) ("Because the office of the Comptroller General is created by statute, the Comptroller General's status within the government is a matter of statutory interpretation which, like all statutory interpretation, is controlled by legislative intent. . . . There is copious evidence in the legislative history that the GAO (and therefore the Comptroller General) was intended to be in the legislative branch. . . . Because there is no legislative intent to the contrary, I believe that it is incumbent upon us to hold that the Comptroller General is within the legislative branch of government, despite the inconveniences that may attend such a holding").

jected levels of unemployment, interest rates, and the special problems that may be confronted by the many components of a vast federal bureaucracy. His duties are anything but ministerial—he is not merely a clerk wearing a "green eyeshade" as he undertakes these tasks. Rather, he is vested with the kind of responsibilities that Congress has elected to discharge itself under the fallback provision that will become effective if and when § 251(b) and § 251(c)(2) are held invalid. Unless we make the naive assumption that the economic destiny of the Nation could be safely entrusted to a mindless bank of computers, the powers that this Act vests in the Comptroller General must be recognized as having transcendent importance.[12]

The Court concludes that the Gramm-Rudman-Hollings Act impermissibly assigns the Comptroller General "executive powers." *Ante,* at 732. JUSTICE WHITE's dissent agrees that "the powers exercised by the Comptroller under the Act may be characterized as 'executive' in that they involve the interpretation and carrying out of the Act's mandate." *Post,* at 765. This conclusion is not only far from obvious but also rests on the unstated and unsound premise that there is a definite line that distinguishes executive power from legislative power.

"The great ordinances of the Constitution do not establish and divide fields of black and white." *Springer* v. *Philippine Islands,* 277 U. S. 189, 209 (1928) (Holmes, J., dissenting). "The men who met in Philadelphia in the summer of 1787 were practical statesmen, experienced in politics, who viewed the principle of separation of powers as a vital check against tyranny. But they likewise saw that a hermetic sealing off of the three branches of Government from one an-

---

[12] The element of judgment that the Comptroller General must exercise is evident by the congressional recognition that there may be "differences between the contents of [his] report and the report of the Directors" of the Congressional Budget Office and the Office of Management and Budget. § 251(b)(2).

other would preclude the establishment of a Nation capable of governing itself effectively." *Buckley* v. *Valeo*, 424 U. S. 1, 121 (1976). As Justice Brandeis explained in his dissent in *Myers* v. *United States*, 272 U. S. 52, 291 (1926): "The separation of the powers of government did not make each branch completely autonomous. It left each, in some measure, dependent upon the others, as it left to each power to exercise, in some respects, functions in their nature executive, legislative and judicial."

One reason that the exercise of legislative, executive, and judicial powers cannot be categorically distributed among three mutually exclusive branches of Government is that governmental power cannot always be readily characterized with only one of those three labels. On the contrary, as our cases demonstrate, a particular function, like a chameleon, will often take on the aspect of the office to which it is assigned. For this reason, "[w]hen any Branch acts, it is presumptively exercising the power the Constitution has delegated to it." *INS* v. *Chadha*, 462 U. S., at 951.[13]

The *Chadha* case itself illustrates this basic point. The governmental decision that was being made was whether a resident alien who had overstayed his student visa should be

---

[13] "Perhaps as a matter of political science we could say that Congress should only concern itself with broad principles of policy and leave their application in particular cases to the executive branch. But no such rule can be found in the Constitution itself or in legislative practice. It is fruitless, therefore, to try to draw any sharp and logical line between legislative and executive functions. Characteristically, the draftsmen of 1787 did not even attempt doctrinaire definitions, but placed their reliance in the mechanics of the Constitution. One of their principal devices was to vest the legislative powers in the two Houses of Congress and to make the President a part of the legislative process by requiring that all bills passed by the two Houses be submitted to him for his approval or disapproval, his disapproval or veto to be overridden only by a two-thirds vote of each House. It is in such checks upon powers, rather than in the classifications of powers, that our governmental system finds equilibrium." Ginnane, The Control of Federal Administration by Congressional Resolutions and Committees, 66 Harv. L. Rev. 569, 571 (1953) (footnote omitted).

deported. From the point of view of the Administrative Law Judge who conducted a hearing on the issue—or as JUSTICE POWELL saw the issue in his concurrence [14]—the decision took on a judicial coloring. From the point of view of the Attorney General of the United States to whom Congress had delegated the authority to suspend deportation of certain aliens, the decision appeared to have an executive character.[15] But, as the Court held, when the House of Representatives finally decided that Chadha must be deported, its action "was essentially legislative in purpose and effect." *Id.*, at 952.

The powers delegated to the Comptroller General by § 251 of the Act before us today have a similar chameleon-like quality. The District Court persuasively explained why they may be appropriately characterized as executive powers.[16] But, when that delegation is held invalid, the "fallback provision" provides that the report that would otherwise be issued by the Comptroller General shall be issued by Congress it-

---

[14] For JUSTICE POWELL the critical question in the *Chadha* case was "whether Congress impermissibly assumed a judicial function." 462 U. S., at 963.

[15] "It is clear, therefore, that the Attorney General acts in his presumptively Art. II capacity when he administers the Immigration and Nationality Act." *Id.*, at 953, n. 16.

[16] "Under subsection 251(b)(1), the Comptroller General must specify levels of anticipated revenue and expenditure that determine the gross amount which must be sequestered; and he must specify which particular budget items are required to be reduced by the various provisions of the Act (which are not in all respects clear), and in what particular amounts. The first of these specifications requires the exercise of substantial judgment concerning present and future facts that affect the application of the law—the sort of power normally conferred upon the executive officer charged with implementing a statute. The second specification requires an interpretation of the law enacted by Congress, similarly a power normally committed initially to the Executive under the Constitution's prescription that he 'take Care that the Laws be faithfully executed.' Art. II, § 3." *Synar* v. *United States*, 626 F. Supp. 1374, 1400 (DC 1986).

self.[17]   In the event that the resolution is enacted, the congressional report will have the same legal consequences as if it had been issued by the Comptroller General.   In that event, moreover, surely no one would suggest that Congress had acted in any capacity other than "legislative."   Since the District Court expressly recognized the validity of what it described as the "'fallback' deficit reduction process," *Synar* v. *United States,* 626 F. Supp. 1374, 1377 (DC 1986), it obviously did not doubt the constitutionality of the performance by Congress of the functions delegated to the Comptroller General.

Under the District Court's analysis, and the analysis adopted by the majority today, it would therefore appear that the function at issue is "executive" if performed by the Comptroller General but "legislative" if performed by the Congress.   In my view, however, the function may appropri-

---

[17] Section 274(f) of the Act provides, in part:

"ALTERNATIVE PROCEDURES FOR THE JOINT REPORTS OF THE DIRECTORS. —

"(1) In the event that any of the reporting procedures described in section 251 are invalidated, then any report of the Directors referred to in section 251(a) or (c)(1) . . . shall be transmitted to the joint committee established under this subsection.

"(2) Upon the invalidation of any such procedure there is established a Temporary Joint Committee on Deficit Reduction, composed of the entire membership of the Budget Committees of the House of Representatives and the Senate. . . . The purposes of the Joint Committee are to receive the reports of the Directors as described in paragraph (1), and to report (with respect to each such report of the Directors) a joint resolution as described in paragraph (3).

"(3) No later than 5 days after the receipt of a report of the Directors in accordance with paragraph (1), the Joint Committee shall report to the House of Representatives and the Senate a joint resolution setting forth the contents of the report of the Directors.

"(5) *Upon its enactment, the joint resolution shall be deemed to be the report received by the President under section 251(b) or (c)(2)* (whichever is applicable)."   99 Stat. 1100 (emphasis added).

ately be labeled "legislative" even if performed by the Comptroller General or by an executive agency.

Despite the statement in Article I of the Constitution that "All legislative Powers herein granted shall be vested in a Congress of the United States," it is far from novel to acknowledge that independent agencies do indeed exercise legislative powers. As JUSTICE WHITE explained in his *Chadha* dissent, after reviewing our cases upholding broad delegations of legislative power:

"[T]hese cases establish that by virtue of congressional delegation, legislative power can be exercised by independent agencies and Executive departments without the passage of new legislation. For some time, the sheer amount of law—the substantive rules that regulate private conduct and direct the operation of government—made by the agencies has far outnumbered the lawmaking engaged in by Congress through the traditional process. There is no question but that agency rulemaking is lawmaking in any functional or realistic sense of the term. The Administrative Procedure Act, 5 U. S. C. § 551(4), provides that a 'rule' is an agency statement 'designed to implement, interpret, or prescribe law or policy.' When agencies are authorized to prescribe law through substantive rulemaking, the administrator's regulation is not only due deference, but is accorded 'legislative effect.' See, *e. g., Schweiker* v. *Gray Panthers*, 453 U. S. 34, 43–44 (1981); *Batterton* v. *Francis*, 432 U. S. 416 (1977). These regulations bind courts and officers of the Federal Government, may preempt state law, see, *e. g., Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta*, 458 U. S. 141 (1982), and grant rights to and impose obligations on the public. In sum, they have the force of law." 462 U. S., at 985–986 (footnote omitted).

Thus, I do not agree that the Comptroller General's responsibilities under the Gramm-Rudman-Hollings Act must be

termed "executive powers," or even that our inquiry is much advanced by using that term. For, whatever the label given the functions to be performed by the Comptroller General under § 251—or by the Congress under § 274—the District Court had no difficulty in concluding that Congress could delegate the performance of those functions to another branch of the Government.[18] If the delegation to a stranger is permissible, why may not Congress delegate the same responsibilities to one of its own agents? That is the central question before us today.

## IV

Congress regularly delegates responsibility to a number of agents who provide important support for its legislative activities. Many perform functions that could be characterized as "executive" in most contexts—the Capitol Police can arrest and press charges against lawbreakers, the Sergeant at Arms manages the congressional payroll, the Capitol Architect maintains the buildings and grounds, and its Librarian has custody of a vast number of books and records. Moreover, the Members themselves necessarily engage in many activities that are merely ancillary to their primary lawmak-

---

[18] "All that has been left to administrative discretion is the estimation of the aggregate amount of reductions that will be necessary, in light of predicted revenues and expenditures, and we believe that the Act contains standards adequately confining administrative discretion in making that estimation. While this is assuredly an estimation that requires some judgment, and on which various individuals may disagree, we hardly think it is a distinctively *political* judgment, much less a political judgment of such scope that it must be made by Congress itself. Through specification of maximum deficit amounts, establishment of a detailed administrative mechanism, and determination of the standards governing administrative decisionmaking, Congress has made the policy decisions which constitute the essence of the legislative function." 626 F. Supp., at 1391.

The District Court's holding that the exercise of discretion was not the kind of political judgment that "must be made by Congress itself" is, of course, consistent with the view that it is a judgment that *"may* be made by Congress itself" pursuant to § 274.

ing responsibilities — they manage their separate offices, they communicate with their constituents, they conduct hearings, they inform themselves about the problems confronting the Nation, and they make rules for the governance of their own business. The responsibilities assigned to the Comptroller General in the case before us are, of course, quite different from these delegations and ancillary activities.

The Gramm-Rudman-Hollings Act assigns to the Comptroller General the duty to make policy decisions that have the force of law. The Comptroller General's report is, in the current statute, the engine that gives life to the ambitious budget reduction process. It is the Comptroller General's report that "provide[s] for the determination of reductions" and that "contain[s] estimates, determinations, and specifications for all of the items contained in the report" submitted by the Office of Management and Budget and the Congressional Budget Office. § 251(b). It is the Comptroller General's report that the President must follow and that will have conclusive effect. § 252. It is, in short, the Comptroller General's report that will have a profound, dramatic, and immediate impact on the Government and on the Nation at large.

Article I of the Constitution specifies the procedures that Congress must follow when it makes policy that binds the Nation: its legislation must be approved by both of its Houses and presented to the President. In holding that an attempt to legislate by means of a "one-House veto" violated the procedural mandate in Article I, we explained:

> "We see therefore that the Framers were acutely conscious that the bicameral requirement and the Presentment Clauses would serve essential constitutional functions. The President's participation in the legislative process was to protect the Executive Branch from Congress and to protect the whole people from improvident laws. The division of the Congress into two distinctive bodies assures that the legislative power would be exer-

cised only after opportunity for full study and debate in separate settings. The President's unilateral veto power, in turn, was limited by the power of two-thirds of both Houses of Congress to overrule a veto thereby precluding final arbitrary action of one person. . . . It emerges clearly that the prescription for legislative action in Art. I, §§ 1, 7, represents the Framers' decision that the legislative power of the Federal Government be exercised in accord with a single, finely wrought and exhaustively considered, procedure." *INS* v. *Chadha*, 462 U. S., at 951.

If Congress were free to delegate its policymaking authority to one of its components, or to one of its agents, it would be able to evade "the carefully crafted restraints spelled out in the Constitution." *Id.*, at 959.[19] That danger—congressional action that evades constitutional restraints—is not present when Congress delegates lawmaking power to the executive or to an independent agency.[20]

The distinction between the kinds of action that Congress may delegate to its own components and agents and those that require either compliance with Article I procedures or delegation to another branch pursuant to defined standards is

---

[19] Even scholars who would have sustained the one-House veto appear to agree with this ultimate conclusion. See Nathanson, Separation of Powers and Administrative Law: Delegation, The Legislative Veto, and the "Independent" Agencies, 75 Nw. U. L. Rev. 1064, 1090 (1981) ("It is not a case where the Congress has delegated authority to one of its components to take affirmative steps to impose regulations upon private interests—an action which would, I assume, be unconstitutional"). Cf. *Buckley* v. *Valeo*, 424 U. S. 1, 286 (1976) (WHITE, J., dissenting) (expressing the opinion that a one-House veto of agency regulations would be unobjectionable, but adding that it "would be considerably different if Congress itself purported to adopt and propound regulations by the action of both Houses").

[20] As I have emphasized, in this case, the Comptroller General is assigned functions that require him to make policy determinations that bind the Nation. I note only that this analysis need not call into question the Comptroller General's performance of numerous existing functions that may not rise to this level. See *ante*, at 734–735, n. 9.

reflected in the practices that have developed over the years regarding congressional resolutions. The *joint* resolution, which is used for "special purposes and . . . incidental matters," 7 Deschler's Precedents of the House of Representatives 334 (1977), makes binding policy and "requires an affirmative vote by both Houses and submission to the President for approval" *id.*, at 333—the full Article I requirements. A *concurrent* resolution, in contrast, makes no binding policy; it is "a means of expressing fact, principles, opinions, and purposes of the two Houses," Jefferson's Manual and Rules of the House of Representatives 176 (1983), and thus does not need to be presented to the President. It is settled, however, that if a resolution is intended to make policy that will bind the Nation and thus is "legislative in its character and effect," S. Rep. No. 1335, 54th Cong., 2d Sess., 8 (1897)—then the full Article I requirements must be observed. For "the nature or substance of the resolution, and not its form, controls the question of its disposition." *Ibid.*

In my opinion, Congress itself could not exercise the Gramm-Rudman-Hollings functions through a concurrent resolution. The fact that the fallback provision in § 274 requires a joint resolution rather than a concurrent resolution indicates that Congress endorsed this view.[21] I think it equally clear that Congress may not simply delegate those functions to an agent such as the Congressional Budget Office. Since I am persuaded that the Comptroller General is also fairly deemed to be an agent of Congress, he too cannot exercise such functions.[22]

---

[21] The fact that Congress specified a joint resolution as the fallback provision has another significance as well. For it reveals the congressional intent that, if the Comptroller General could not exercise the prescribed functions, Congress wished to perform them itself, rather than delegating them, for instance, to an independent agency or to an Executive Branch official. This choice shows that Congress intended that the important functions of the Act be no further from itself than the Comptroller General.

[22] In considering analogous problems, our state courts have consistently recognized the importance of strict adherence to constitutionally mandated

As a result, to decide this case there is no need to consider the Decision of 1789, the President's removal power, or the abstract nature of "executive powers." Once it is clear that the Comptroller General, whose statutory duties define him as an agent of Congress, has been assigned the task of making policy determinations that will bind the Nation, the question is simply one of congressional process. There can be no doubt that the Comptroller General's statutory duties under Gramm-Rudman-Hollings do not follow the constitutionally prescribed procedures for congressional lawmaking.[23]

In short, even though it is well settled that Congress may delegate legislative power to independent agencies or to the Executive, and thereby divest itself of a portion of its lawmaking power, when it elects to exercise such power itself, it may not authorize a lesser representative of the Legislative

---

procedures in the legislative process. See, e. g., State v. A. L. I. V. E. Voluntary, 606 P. 2d 769, 773, 777 (Alaska 1980) ("Of course, when the legislature wishes to act in an advisory capacity it may act by resolution. However, when it means to take action having a binding effect on those outside the legislature it may do so only by following the enactment procedures. Other state courts have so held with virtual unanimity. . . . The fact that it can delegate legislative power to others who are not bound by article II does not mean that it can delegate the same power to itself and, in the process, escape from the constraints under which it must operate"); People v. Tremaine, 252 N. Y. 27, 44 168 N. E. 817, 822 (1929) ("If the power to approve the segregation of lump sum appropriations may be delegated to any one, even to one or two members of the Legislature, it necessarily follows that the power to segregate such appropriations may also be conferred upon such delegates. . . . To visualize an extreme case, one lump sum appropriation might be made to be segregated by the committee chairmen. Such a delegation of legislative power would be abhor[r]ent to all our notions of legislation on the matter of appropriations").

[23] I have previously noted my concern about the need for a "due process of lawmaking" even when Congress has acted with bicameralism and presentment. See Fullilove v. Klutznick, 448 U. S. 448, 549, and n. 24 (1980) (STEVENS, J., dissenting); Delaware Tribal Business Committee v. Weeks, 430 U. S. 73, 98, and n. 11 (1977) (STEVENS, J., dissenting). When a legislature's agent is given powers to act without even the formalities of the legislative process, these concerns are especially prominent.

Branch to act on its behalf.[24]    It is for this reason that I believe § 251(b) and § 251(c)(2) of the Act are unconstitutional.[25]

Thus, the critical inquiry in this case concerns not the manner in which executive officials or agencies may act, but the manner in which Congress and its agents may act.    As we emphasized in *Chadha,* when Congress legislates, when it makes binding policy, it must follow the procedures prescribed in Article I.    Neither the unquestioned urgency of the national budget crisis nor the Comptroller General's proud record of professionalism and dedication provides a justification for allowing a congressional agent to set policy that binds

---

[24] See also Watson, Congress Steps Out: A Look at Congressional Control of the Executive, 63 Calif. L. Rev. 983, 1067, n. 430 (1975) ("A delegation which disperses power is not necessarily constitutionally equivalent to one which concentrates power in the hands of the delegating agency"); Ginnane, 66 Harv. L. Rev., at 595 ("It is a non sequitur to say that, since a statute can delegate a power to someone not bound by the procedure prescribed in the Constitution for Congress' exercise of the power, it can therefore 'delegate' the power to Congress free of constitutional restrictions on the manner of its exercise").

[25] JUSTICE BLACKMUN suggests that Congress may delegate legislative power to one of its own agents as long as it does not retain "tight control" over that agent.    *Post,* at 779, n. 1.    His suggestion is not faithful to the rationale of *Chadha* because no component of Congress, not even one of its Houses, is subject to the "tight control" of the entire Congress.    For instance, the Congressional Research Service, whose primary function is to respond to congressional research requests, 2 U. S. C. § 166, apparently would not fall within JUSTICE BLACKMUN's "tight control" test because Congress has guaranteed the Service "complete research independence and the maximum practicable administrative independence consistent with these objectives." § 166(b)(2).    I take it, however, that few would doubt the unconstitutionality of assigning the functions at issue in this case to the Congressional Research Service.    Moreover, *Chadha* surely forecloses the suggestion that because delegation of legislative power to an independent agency is acceptable, such power may also be delegated to a component or an agent of Congress.    Finally, with respect to JUSTICE BLACKMUN's emphasis on Presidential appointment of the Comptroller General, *post,* at 778–779, n. 1, as I have previously pointed out, other obvious congressional agents, such as the Librarian of Congress, the Architect of the Capitol, and the Public Printer are also appointed by the President.    See n. 9, *supra.*

the Nation. Rather than turning the task over to its agent, if the Legislative Branch decides to act with conclusive effect, it must do so through a process akin to that specified in the fallback provision—through enactment by both Houses and presentment to the President.

I concur in the judgment.

JUSTICE WHITE, dissenting.

The Court, acting in the name of separation of powers, takes upon itself to strike down the Gramm-Rudman-Hollings Act, one of the most novel and far-reaching legislative responses to a national crisis since the New Deal. The basis of the Court's action is a solitary provision of another statute that was passed over 60 years ago and has lain dormant since that time. I cannot concur in the Court's action. Like the Court, I will not purport to speak to the wisdom of the policies incorporated in the legislation the Court invalidates; that is a matter for the Congress and the Executive, *both* of which expressed their assent to the statute barely half a year ago. I will, however, address the wisdom of the Court's willingness to interpose its distressingly formalistic view of separation of powers as a bar to the attainment of governmental objectives through the means chosen by the Congress and the President in the legislative process established by the Constitution. Twice in the past four years I have expressed my view that the Court's recent efforts to police the separation of powers have rested on untenable constitutional propositions leading to regrettable results. See *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 92–118 (1982) (WHITE, J., dissenting); *INS* v. *Chadha*, 462 U. S. 919, 967–1003 (1983) (WHITE, J., dissenting). Today's result is even more misguided. As I will explain, the Court's decision rests on a feature of the legislative scheme that is of minimal practical significance and that presents no substantial threat to the basic scheme of separation of powers. In attaching dispositive significance to what should be regarded as a triviality, the Court neglects what has

in the past been recognized as a fundamental principle governing consideration of disputes over separation of powers:

> "The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government." *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 635 (1952) (Jackson, J. concurring).

I

The Court's argument is straightforward: the Act vests the Comptroller General with "executive" powers, that is, powers to "[i]nterpre[t] a law enacted by Congress [in order] to implement the legislative mandate," *ante,* at 733; such powers may not be vested by Congress in itself or its agents, see *Buckley* v. *Valeo,* 424 U. S. 1, 120–141 (1976), for the system of Government established by the Constitution for the most part limits Congress to a legislative rather than an executive or judicial role, see *INS* v. *Chadha, supra;* the Comptroller General is an agent of Congress by virtue of a provision in the Budget and Accounting Act of 1921, 43 Stat. 23, 31 U. S. C. § 703(e)(1), granting Congress the power to remove the Comptroller for cause through joint resolution; therefore the Comptroller General may not constitutionally exercise the executive powers granted him in the Gramm-Rudman-Hollings Act, and the Act's automatic budget-reduction mechanism, which is premised on the Comptroller's exercise of those powers, must be struck down.

Before examining the merits of the Court's argument, I wish to emphasize what it is that the Court quite pointedly and correctly does *not* hold: namely, that "executive" powers of the sort granted the Comptroller by the Act may only be exercised by officers removable at will by the President.

The Court's apparent unwillingness to accept this argument,[1] which has been tendered in this Court by the Solicitor General,[2] is fully consistent with the Court's longstanding recognition that it is within the power of Congress under the "Necessary and Proper" Clause, Art. I, § 8, to vest authority that falls within the Court's definition of executive power in officers who are not subject to removal at will by the President and are therefore not under the President's direct control. See, *e. g.*, *Humphrey's Executor* v. *United States*, 295 U. S. 602 (1935); *Wiener* v. *United States*, 357 U. S. 349 (1958).[3]  In an earlier day, in which simpler notions of the role of government in society prevailed, it was perhaps plausible to insist that all "executive" officers be subject to an unqualified Presidential removal power, see *Myers* v. *United States*, 272 U. S. 52 (1926); but with the advent and triumph of the administrative state and the accompanying multiplication of the tasks undertaken by the Federal Government, the

---

[1] See *ante*, at 724–726, and n. 4.

[2] The Solicitor General appeared on behalf of the "United States," or, more properly, the Executive Departments, which intervened to attack the constitutionality of the statute that the Chief Executive had earlier endorsed and signed into law.

[3] Although the Court in *Humphrey's Executor* characterized the powers of the Federal Trade Commissioner whose tenure was at issue as "quasi-legislative" and "quasi-judicial," it is clear that the FTC's power to enforce and give content to the Federal Trade Commission Act's proscription of "unfair" acts and practices and methods of competition is in fact "executive" in the same sense as is the Comptroller's authority under Gramm-Rudman-Hollings — that is, it involves the implementation (or the interpretation and application) of an Act of Congress.  Thus, although the Court in *Humphrey's Executor* found the use of the labels "quasi-legislative" and "quasi-judicial" helpful in "distinguishing" its then-recent decision in *Myers* v. *United States*, 272 U. S. 52 (1926), these terms are hardly of any use in limiting the holding of the case; as Justice Jackson pointed out, "[t]he mere retreat to the qualifying 'quasi' is implicit with confession that all recognized classifications have broken down, and 'quasi' is a smooth cover which we draw over our confusion as we might use a counterpane to conceal a disordered bed."  *FTC* v. *Ruberoid Co.*, 343 U. S. 470, 487–488 (1952) (dissenting).

Court has been virtually compelled to recognize that Congress may reasonably deem it "necessary and proper" to vest some among the broad new array of governmental functions in officers who are free from the partisanship that may be expected of agents wholly dependent upon the President.

The Court's recognition of the legitimacy of legislation vesting "executive" authority in officers independent of the President does not imply derogation of the President's own constitutional authority—indeed, duty—to "take Care that the Laws be faithfully executed," Art. II, §3, for any such duty is necessarily limited to a great extent by the content of the laws enacted by the Congress. As Justice Holmes put it: "The duty of the President to see that the laws be executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power." *Myers* v. *United States, supra,* at 177 (dissenting).[4] Justice Holmes perhaps overstated his case, for there are undoubtedly executive functions that, regardless of the enactments of Congress, must be performed by officers subject to removal at will by the President. Whether a particular function falls within this class or within the far larger class that may be relegated to independent officers "will depend upon the character of the office." *Humphrey's Executor, supra,* at 631. In determining whether a limitation on the President's power to remove an officer performing executive functions constitutes a violation of the constitutional scheme of separation of powers, a court must "focu[s] on the extent to which [such a limitation] prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Nixon* v. *Administrator of General Services,* 433 U. S. 425, 443 (1977). "Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Ibid.* This inquiry

---

[4] Cf. *ante,* at 733 ("[U]ndoubtedly the content of the Act determines the nature of the executive duty").

is, to be sure, not one that will beget easy answers; it provides nothing approaching a bright-line rule or set of rules. Such an inquiry, however, is necessitated by the recognition that "formalistic and unbending rules" in the area of separation of powers may "unduly constrict Congress' ability to take needed and innovative action pursuant to its Article I powers." *Commodity Futures Trading Comm'n* v. *Schor, post,* at 851.

It is evident (and nothing in the Court's opinion is to the contrary) that the powers exercised by the Comptroller General under the Gramm-Rudman-Hollings Act are not such that vesting them in an officer not subject to removal at will by the President would in itself improperly interfere with Presidential powers. Determining the level of spending by the Federal Government is not by nature a function central either to the exercise of the President's enumerated powers or to his general duty to ensure execution of the laws; rather, appropriating funds is a peculiarly legislative function, and one expressly committed to Congress by Art. I, § 9, which provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." In enacting Gramm-Rudman-Hollings, Congress has chosen to exercise this legislative power to establish the level of federal spending by providing a detailed set of criteria for reducing expenditures below the level of appropriations in the event that certain conditions are met. Delegating the execution of this legislation—that is, the power to apply the Act's criteria and make the required calculations—to an officer independent of the President's will does not deprive the President of any power that he would otherwise have or that is essential to the performance of the duties of his office. Rather, the result of such a delegation, from the standpoint of the President, is no different from the result of more traditional forms of appropriation: under either system, the level of funds available to the Executive Branch to carry out its duties is not within the President's discretionary control. To be sure,

if the budget-cutting mechanism required the responsible officer to exercise a great deal of policymaking discretion, one might argue that having created such broad discretion Congress had some obligation based upon Art. II to vest it in the Chief Executive or his agents. In Gramm-Rudman-Hollings, however, Congress has done no such thing; instead, it has created a precise and articulated set of criteria designed to minimize the degree of policy choice exercised by the officer executing the statute and to ensure that the relative spending priorities established by Congress in the appropriations it passes into law remain unaltered.[5] Given that the exercise of policy choice by the officer executing the statute would be inimical to Congress' goal in enacting "automatic" budget-cutting measures, it is eminently reasonable and proper for Congress to vest the budget-cutting authority in an officer who is to the greatest degree possible nonpartisan and independent of the President and his political agenda and who therefore may be relied upon not to allow his calculations to be colored by political considerations. Such a delegation deprives the President of no authority that is rightfully his.

## II

If, as the Court seems to agree, the assignment of "executive" powers under Gramm-Rudman-Hollings to an officer not removable at will by the President would not in itself represent a violation of the constitutional scheme of separated

---

[5] That the statute provides, to the greatest extent possible, precise guidelines for the officer assigned to carry out the required budget cuts not only indicates that vesting budget-cutting authority in an officer independent of the President does not in any sense deprive the President of a significant amount of discretionary authority that should rightfully be vested in him or an officer accountable to him, but also answers the claim that the Act represents an excessive and hence unlawful delegation of legislative authority. Because the majority does not address the delegation argument, I shall not discuss it at any length, other than to refer the reader to the District Court's persuasive demonstration that the statute is not void under the nondelegation doctrine.

powers, the question remains whether, as the Court concludes, the fact that the officer to whom Congress has delegated the authority to implement the Act is removable by a joint resolution of Congress should require invalidation of the Act. The Court's decision, as I have stated above, is based on a syllogism: the Act vests the Comptroller with "executive power"; such power may not be exercised by Congress or its agents; the Comptroller is an agent of Congress because he is removable by Congress; therefore the Act is invalid. I have no quarrel with the proposition that the powers exercised by the Comptroller under the Act may be characterized as "executive" in that they involve the interpretation and carrying out of the Act's mandate. I can also accept the general proposition that although Congress has considerable authority in designating the officers who are to execute legislation, see *supra*, at 760–764, the constitutional scheme of separated powers does prevent Congress from reserving an executive role for itself or for its "agents." *Buckley* v. *Valeo*, 424 U. S., at 120–141; *id.*, at 267–282 (WHITE, J., concurring in part and dissenting in part). I cannot accept, however, that the exercise of authority by an officer removable for cause by a joint resolution of Congress is analogous to the impermissible execution of the law by Congress itself, nor would I hold that the congressional role in the removal process renders the Comptroller an "agent" of the Congress, incapable of receiving "executive" power.

In *Buckley* v. *Valeo*, *supra*, the Court held that Congress could not reserve to itself the power to appoint members of the Federal Election Commission, a body exercising "executive" power. *Buckley*, however, was grounded on a textually based separation-of-powers argument whose central premise was that the Constitution requires that all "Officers of the United States" (defined as "all persons who can be said to hold an office under the government," 424 U. S., at 126) whose appointment is not otherwise specifically provided for elsewhere in its text be appointed through the means speci-

fied by the Appointments Clause, Art. II, § 2, cl. 2—that is, either by the President with the advice and consent of the Senate or, if Congress so specifies, by the President alone, by the courts, or by the head of a department. The *Buckley* Court treated the Appointments Clause as reflecting the principle that "the Legislative Branch may not exercise executive authority," 424 U. S., at 119 (citing *Springer* v. *Philippine Islands,* 277 U. S. 189 (1928)), but the Court's holding was merely that Congress may not direct that its laws be implemented through persons who are its agents in the sense that it chose them; the Court did not pass on the legitimacy of other means by which Congress might exercise authority over those who execute its laws. Because the Comptroller is not an appointee of Congress but an officer of the United States appointed by the President with the advice and consent of the Senate, *Buckley* neither requires that he be characterized as an agent of the Congress nor in any other way calls into question his capacity to exercise "executive" authority. See 424 U. S., at 128, n. 165.

As the majority points out, however, the Court's decision in *INS* v. *Chadha,* 462 U. S. 919 (1983), recognizes additional limits on the ability of Congress to participate in or influence the execution of the laws. As interpreted in *Chadha,* the Constitution prevents Congress from interfering with the actions of officers of the United States through means short of legislation satisfying the demands of bicameral passage and presentment to the President for approval or disapproval. *Id.,* at 954–955. Today's majority concludes that the same concerns that underlay *Chadha* indicate the invalidity of a statutory provision allowing the removal by joint resolution for specified cause of any officer performing executive functions. Such removal power, the Court contends, constitutes a "congressional veto" analogous to that struck down in *Chadha,* for it permits Congress to "remove, or threaten to remove, an officer for executing the laws in any fashion found to be unsatisfactory." *Ante,* at 726. The Court concludes

that it is "[t]his kind of congressional control over the execution of the laws" that *Chadha* condemns. *Ante*, at 726–727.

The deficiencies in the Court's reasoning are apparent. First, the Court baldly mischaracterizes the removal provision when it suggests that it allows Congress to remove the Comptoller for "executing the laws in any fashion found to be unsatisfactory"; in fact, Congress may remove the Comptroller only for one or more of five specified reasons, which "although not so narrow as to deny Congress any leeway, circumscribe Congress' power to some extent by providing a basis for judicial review of congressional removal." *Ameron, Inc.* v. *United States Army Corps of Engineers*, 787 F. 2d 875, 895 (CA3 1986) (Becker, J., concurring in part). Second, and more to the point, the Court overlooks or deliberately ignores the decisive difference between the congressional removal provision and the legislative veto struck down in *Chadha:* under the Budget and Accounting Act, Congress may remove the Comptroller only through a joint resolution, which by definition must be passed by both Houses and signed by the President. See *United States* v. *California*, 332 U. S. 19, 28 (1947).[6] In other words, a removal of the Comptroller under the statute *satisfies the requirements of bicameralism and presentment laid down in* Chadha. The majority's citation of *Chadha* for the proposition that Congress may only control the acts of officers of the United States "by passing new legislation," *ante*, at 734, in

[6] The legislative history indicates that the inclusion of the President in the removal process was a deliberate choice on the part of the Congress that enacted the Budget and Accounting Act. The previous year, legislation establishing the position of Comptroller General and providing for removal by *concurrent* resolution—that is, by a resolution not presented to the President—had been vetoed by President Wilson on the ground that granting the sole power of removal to the Congress would be unconstitutional. See 59 Cong. Rec. 8609–8610 (1920). That Congress responded by providing for removal through joint resolution clearly evinces congressional intent that removal take place only through the legislative process, with Presidential participation.

no sense casts doubt on the legitimacy of the removal provision, for that provision allows Congress to effect removal only through action that constitutes legislation as defined in *Chadha*.

To the extent that it has any bearing on the problem now before us, *Chadha* would seem to suggest the legitimacy of the statutory provision making the Comptroller removable through joint resolution, for the Court's opinion in *Chadha* reflects the view that the bicameralism and presentment requirements of Art. I represent the principal assurances that Congress will remain within its legislative role in the constitutionally prescribed scheme of separated powers. Action taken in accordance with the "single, finely wrought, and exhaustively considered, procedure" established by Art. I, *Chadha, supra,* at 951, should be presumptively viewed as a legitimate exercise of legislative power. That such action may represent a more or less successful attempt by Congress to "control" the actions of an officer of the United States surely does not in itself indicate that it is unconstitutional, for no one would dispute that Congress has the power to "control" administration through legislation imposing duties or substantive restraints on executive officers, through legislation increasing or decreasing the funds made available to such officers, or through legislation actually abolishing a particular office. Indeed, *Chadha* expressly recognizes that while congressional meddling with administration of the laws outside of the legislative process is impermissible, congressional control over executive officers exercised through the legislative process is valid. 462 U. S., at 955, n. 19. Thus, if the existence of a statute permitting removal of the Comptroller through joint resolution (that is, through the legislative process) renders his exercise of executive powers unconstitutional, it is for reasons having virtually nothing to do with *Chadha*.[7]

---

[7] Because a joint resolution passed by both Houses of Congress and signed by the President (or repassed over the President's veto) is legisla-

That a joint resolution removing the Comptroller General would satisfy the requirements for legitimate legislative action laid down in *Chadha* does not fully answer the separation-of-powers argument, for it is apparent that even the results of the constitutional legislative process may be unconstitutional if those results are in fact destructive of the scheme of separation of powers. *Nixon* v. *Administrator of General*

---

tion having the same force as any other Act of Congress, it is somewhat mysterious why the Court focuses on the Budget and Accounting Act's authorization of removal of the Comptroller through such a resolution as an indicator that the Comptroller may not be vested with executive powers. After all, even without such prior statutory authorization, Congress could pass, and the President sign, a joint resolution purporting to remove the Comptroller, and the validity of such legislation would seem in no way dependent on previous legislation contemplating it. Surely the fact that Congress might at any time pass and the President sign legislation purporting to remove some officer of the United States does not make the exercise of executive power by all such officers unconstitutional. Since the effect of the Budget and Accounting Act is merely to recognize the possibility of legislation that Congress might at any time attempt to enact with respect to any executive officer, it should not make the exercise of "executive" power by the Comptroller any more problematic than the exercise of such power by any other officer. A joint resolution purporting to remove the Comptroller, or any other executive officer, might be constitutionally infirm, but Congress' advance assertion of the power to enact such legislation seems irrelevant to the question whether exercise of authority by an officer who might in the future be subject to such a possibly valid and possibly invalid resolution is permissible, since the provision contemplating a resolution of removal obviously cannot in any way add to Congress' power to enact such a resolution.

Of course, the foregoing analysis does not imply that the removal provision of the Budget and Accounting Act is meaningless; for although that provision cannot *add to* any power Congress might have to pass legislation (that is, a joint resolution) removing the Comptroller, it can *limit* its power to do so to the circumstances specified. The reason for this is that any joint resolution purporting to remove the Comptroller in the absence of a hearing or one of the specified grounds for removal would not be deemed an implied repeal of the limits on removal in the 1921 Act (for such implied repeals are disfavored), and thus the joint resolution would only be given effect to the extent consistent with the pre-existing law (that is, to the extent that there was actually cause for removal).

*Services,* 433 U. S. 425 (1977). The question to be answered is whether the threat of removal of the Comptroller General for cause through joint resolution as authorized by the Budget and Accounting Act renders the Comptroller sufficiently subservient to Congress that investing him with "executive" power can be realistically equated with the unlawful retention of such power by Congress itself; more generally, the question is whether there is a genuine threat of "encroachment or aggrandizement of one branch at the expense of the other," *Buckley* v. *Valeo,* 424 U. S., at 122. Common sense indicates that the existence of the removal provision poses no such threat to the principle of separation of powers.

The statute does not permit anyone to remove the Comptroller at will; removal is permitted only for specified cause, with the existence of cause to be determined by Congress following a hearing. Any removal under the statute would presumably be subject to post-termination judicial review to ensure that a hearing had in fact been held and that the finding of cause for removal was not arbitrary. See *Ameron, Inc.* v. *United States Army Corps of Engineers,* 787 F. 2d, at 895 (Becker, J., concurring in part).[8] These procedural and substantive limitations on the removal power militate strongly against the characterization of the Comptroller as a mere agent of Congress by virtue of the removal authority. Indeed, similarly qualified grants of removal power are generally deemed to protect the officers to whom they apply and to establish their independence from the domination of the possessor of the removal power. See *Humphrey's Executor* v. *United States,* 295 U. S., at 625–626, 629–630. Removal authority limited in such a manner is more properly viewed as motivating adherence to a substantive standard established by law than as inducing subservience to the particular

---

[8] Cf. *Humphrey's Executor* v. *United States,* 295 U. S. 602 (1935), in which the Court entertained a challenge to Presidential removal under a statute that similarly limited removals to specified cause.

institution that enforces that standard. That the agent enforcing the standard is Congress may be of some significance to the Comptroller, but Congress' substantively limited removal power will undoubtedly be less of a spur to subservience than Congress' unquestionable and unqualified power to enact legislation reducing the Comptroller's salary, cutting the funds available to his department, reducing his personnel, limiting or expanding his duties, or even abolishing his position altogether.

More importantly, the substantial role played by the President in the process of removal through joint resolution reduces to utter insignificance the possibility that the threat of removal will induce subservience to the Congress. As I have pointed out above, a joint resolution must be presented to the President and is ineffective if it is vetoed by him, unless the veto is overridden by the constitutionally prescribed two-thirds majority of both Houses of Congress. The requirement of Presidential approval obviates the possibility that the Comptroller will perceive himself as so completely at the mercy of Congress that he will function as its tool.[9] If the Comptroller's conduct in office is not so unsatisfactory to the President as to convince the latter that removal is required under the statutory standard, Congress will have no independent power to coerce the Comptroller unless it can muster a two-thirds majority in both Houses—a feat of bipartisanship more difficult than that required to impeach and convict. The incremental *in terrorem* effect of the possibility of congressional removal in the face of a Presidential

---

[9] The Court cites statements made by supporters of the Budget and Accounting Act indicating their belief that the Act's removal provisions would render the Comptroller subservient to Congress by giving Congress " 'absolute control of the man's destiny in office.' " *Ante*, at 728. The Court's scholarship, however, is faulty: at the time all of these statements were made—including Representative Sisson's statement of May 3, 1921—the proposed legislation provided for removal by concurrent resolution, with no Presidential role. See 61 Cong. Rec. 983, 989–992, 1079–1085 (1921).

veto is therefore exceedingly unlikely to have any discernible impact on the extent of congressional influence over the Comptroller.[10]

---

[10] Concededly, the substantive grounds for removal under the statute are broader than the grounds for impeachment specified by the Constitution, see *ante*, at 729–730, although given that it is unclear whether the limits on the impeachment power may be policed by any body other than Congress itself, the practical significance of the difference is hard to gauge. It seems to me most likely that the difficulty of obtaining a two-thirds vote for removal in both Houses would more than offset any increased likelihood of removal that might result from the greater liberality of the substantive grounds for removal under the statute. And even if removal by Congress alone through joint resolution passed over Presidential veto is marginally more likely than impeachment, whatever additional influence over the Comptroller Congress may thereby possess seems likely to be minimal in relation to that which Congress already possesses by virtue of its general legislative powers and its power to impeach. Of course, if it were demonstrable that the Constitution specifically limited Congress' role in removal to the impeachment process, the insignificance of the marginal increase in congressional influence resulting from the provision authorizing removal through joint resolution would be no answer to a claim of unconstitutionality. But no such limit appears in the Constitution: the Constitution merely provides that all officers of the United States may be impeached for high crimes and misdemeanors, and nowhere suggests that impeachment is the sole means of removing such officers.

As for the Court's observation that "no one would seriously suggest that judicial independence would be strengthened by allowing removal of federal judges only by a joint resolution finding 'inefficiency,' 'neglect of duty,' or 'malfeasance,'" *ante*, at 730, it can only be described as a non sequitur. The issue is not whether the removal provision makes the Comptroller *more* independent than he would be if he were removable only through impeachment, but whether the provision so weakens the Comptroller that he may not exercise executive authority. Moreover, the Court's reference to standards applicable to removal of Art. III judges is a red herring, for Art. III judges — unlike other officers of the United States — are specifically protected against removal for other than constitutionally specified cause. Thus, the infirmity of a statute purporting to allow removal of judges for some other reason would be that it violated the specific command of Art. III. In the absence of a similar textual limit on the removal of nonjudicial officers, the test for a violation of separation of powers should be whether an asserted congressional power to remove would constitute a real and sub-

The practical result of the removal provision is not to render the Comptroller unduly dependent upon or subservient to Congress, but to render him one of the most independent officers in the entire federal establishment. Those who have studied the office agree that the procedural and substantive limits on the power of Congress and the President to remove the Comptroller make dislodging him against his will practically impossible. As one scholar put it nearly 50 years ago: "Under the statute the Comptroller General, once confirmed, is safe so long as he avoids a public exhibition of personal immorality, dishonesty, or failing mentality." H. Mansfield, The Comptroller General 75–76 (1939).[11] The passage of time has done little to cast doubt on this view: of the six Comptrollers who have served since 1921, none has been threatened with, much less subjected to, removal. Recent students of the office concur that "[b]arring resignation, death, physical or mental incapacity, or extremely bad behavior, the Comptroller General is assured his tenure if he wants it, and not a day more." F. Mosher, The GAO 242 (1979).[12] The threat of "here-and-now subservience," *ante*, at 720, is obviously remote indeed.[13]

stantial aggrandizement of congressional authority at the expense of executive power, not whether a similar removal provision would appear problematic if applied to federal judges.

[11] The author of this statement was no apologist for the Comptroller; rather, his study of the office is premised on the desirability of Presidential control over many of the Comptroller's functions. Nonetheless, he apparently found no reason to accuse the Comptroller of subservience to Congress, and he conceded that "[t]he political independence of the office has in fact been one of its outstanding characteristics." H. Mansfield, The Comptroller General 75 (1939).

[12] Professor Mosher's reference to the fact that the Comptroller is limited to a single term highlights an additional source of independence: unlike an officer with a fixed term who may be reappointed to office, the Comptroller need not concern himself with currying favor with the Senate in order to secure its consent to his reappointment.

[13] The majority responds to the facts indicating the practical independence of the Comptroller from congressional control by cataloging a series of

Realistic consideration of the nature of the Comptroller General's relation to Congress thus reveals that the threat to separation of powers conjured up by the majority is wholly chimerical. The power over removal retained by the Congress is not a power that is exercised outside the legislative process as established by the Constitution, nor does it appear likely that it is a power that adds significantly to the influence Congress may exert over executive officers through other, undoubtedly constitutional exercises of legislative power and through the constitutionally guaranteed impeachment power. Indeed, the removal power is so constrained by its own substantive limits and by the requirement of Presidential ap-

statements and materials categorizing the Comptroller as a part of the "Legislative Branch." *Ante*, at 730–732. Such meaningless labels are quite obviously irrelevant to the question whether in actuality the Comptroller is so subject to congressional domination that he may not participate in the execution of the laws.

JUSTICE STEVENS, for his part, finds that the Comptroller is an "agent" of Congress, and thus incapable of wielding the authority granted him by the Act, because his responsibilities under a variety of statutes include making reports to the Congress. JUSTICE STEVENS' position is puzzling, to say the least. It seems to rest on the view that an officer required to perform certain duties for the benefit of Congress somehow becomes a part of Congress for all purposes. But it is by no means true that an officer who must perform specified duties for some other body is under that body's control or acts as its agent when carrying out other, unrelated duties. As JUSTICE BLACKMUN points out, see *post*, at 778–779, n. 1, duties toward Congress are imposed on a variety of agencies, including the Federal Trade Commission; and certainly it cannot credibly be maintained that by virtue of those duties the agencies become branches of Congress, incapable of wielding governmental power except through the legislative process. Indeed, the President himself is under numerous obligations, both statutory and constitutional, to provide information to Congress, see, *e. g.*, Art. II, § 3, cl. 1; surely the President is not thereby transformed into an arm or agency of the Congress. If, therefore, as JUSTICE STEVENS concedes, see *ante*, at 737–741, the provision authorizing removal of the Comptroller by joint resolution does not suffice to establish that he may not exercise the authority granted him under Gramm-Rudman-Hollings, I see no substantial basis for concluding that his various duties toward Congress render him incapable of receiving such power.

proval "that, as a practical matter, Congress has not exercised, and probably will never exercise, such control over the Comptroller General that his non-legislative powers will threaten the goal of dispersion of power, and hence the goal of individual liberty, that separation of powers serves." *Ameron, Inc.* v. *United States Army Corps of Engineers,* 787 F. 2d, at 895 (Becker, J., concurring in part).[14]

---

[14] Even if I were to concede that the exercise of executive authority by the Comptroller is inconsistent with the removal provision, I would agree with JUSTICE BLACKMUN that striking down the provisions of the Gramm-Rudman-Hollings Act vesting the Comptroller with such duties is a grossly inappropriate remedy for the supposed constitutional infirmity, and that if one of the features of the statutory scheme must go, it should be the removal provision. As JUSTICE BLACKMUN points out, the mere fact that the parties before the Court have standing only to seek invalidation of the Gramm-Rudman-Hollings spending limits cannot dictate that the Court resolve any constitutional incompatibility by striking down Gramm-Rudman-Hollings. Nor does the existence of the fallback provisions in Gramm-Rudman-Hollings indicate the appropriateness of the Court's choice, for those provisions, by their terms, go into effect only if the Court finds that the primary budget-cutting mechanism established by the Act must be invalidated; they by no means answer the antecedent question whether the Court should take that step.

Given the majority's constitutional premises, it is clear to me that the decision whether to strike down Gramm-Rudman-Hollings must depend on whether such a choice would be more or less disruptive of congressional objectives than declaring the removal provision invalid (with the result that the Comptroller would still be protected against removal at will by the President, but could also not be removed through joint resolution). When the choice is put in these terms, it is evident that it is the never-used removal provision that is far less central to the overall statutory scheme. That this is so is underscored by the fact that under the majority's theory, the removal provision was *never* constitutional, as the Comptroller's primary duties under the 1921 Act were clearly executive under the Court's definition: the Comptroller's most important tasks under that legislation were to dictate accounting techniques for all executive agencies, to audit all federal expenditures, and to approve or disapprove disbursement of funds. See F. Mosher, The GAO (1979). Surely the Congress in 1921 would have sacrificed its own role in removal rather than allow such duties to go unfulfilled by a Comptroller independent of the President. See 59 Cong. Rec. 8611 (1920).

The majority's contrary conclusion rests on the rigid dogma that, outside of the impeachment process, any "direct congressional role in the removal of officers charged with the execution of the laws . . . is inconsistent with separation of powers." *Ante*, at 723. Reliance on such an unyielding principle to strike down a statute posing no real danger of aggrandizement of congressional power is extremely misguided and insensitive to our constitutional role. The wisdom of vesting "executive" powers in an officer removable by joint resolution may indeed be debatable—as may be the wisdom of the entire scheme of permitting an unelected official to revise the budget enacted by Congress—but such matters are for the most part to be worked out between the Congress and the President through the legislative process, which affords each branch ample opportunity to defend its interests. The Act vesting budget-cutting authority in the Comptroller General represents Congress' judgment that the delegation of such authority to counteract ever-mounting deficits is "necessary and proper" to the exercise of the powers granted the Federal Government by the Constitution; and the President's approval of the statute signifies his unwillingness to reject the choice made by Congress. Cf. *Nixon* v. *Administrator of General Services*, 433 U. S., at 441. Under such circumstances, the role of this Court should be limited to determining whether the Act so alters the balance of authority among the branches of government as to pose a genuine threat to the basic division between the lawmaking power and the power to execute the law. Because I see no such threat, I cannot join the Court in striking down the Act.

I dissent.

JUSTICE BLACKMUN, dissenting.

The Court may be correct when it says that Congress cannot constitutionally exercise removal authority over an official vested with the budget-reduction powers that § 251 of the Balanced Budget and Emergency Deficit Control Act of 1985

gives to the Comptroller General. This, however, is not because "the removal powers over the Comptroller General's office dictate that he will be subservient to Congress," *ante*, at 730; I agree with JUSTICE WHITE that any such claim is unrealistic. Furthermore, I think it is clear under *Humphrey's Executor* v. *United States*, 295 U. S. 602 (1935), that "executive" powers of the kind delegated to the Comptroller General under the Deficit Control Act need not be exercised by an officer who serves at the President's pleasure; Congress certainly could prescribe the standards and procedures for removing the Comptroller General. But it seems to me that an attempt by Congress to participate *directly* in the removal of an executive officer—other than through the constitutionally prescribed procedure of impeachment—might well violate the principle of separation of powers by assuming for Congress part of the President's constitutional responsibility to carry out the laws.

In my view, however, that important and difficult question need not be decided in this litigation, because no matter how it is resolved the plaintiffs, now appellees, are not entitled to the relief they have requested. Appellees have not sought invalidation of the 1921 provision that authorizes Congress to remove the Comptroller General by joint resolution; indeed, it is far from clear they would have standing to request such a judgment. The only relief sought in this case is nullification of the automatic budget-reduction provisions of the Deficit Control Act, and that relief should not be awarded even if the Court is correct that those provisions are constitutionally incompatible with Congress' authority to remove the Comptroller General by joint resolution. Any incompatibility, I feel, should be cured by refusing to allow congressional removal—if it ever is attempted—and not by striking down the central provisions of the Deficit Control Act. However wise or foolish it may be, that statute unquestionably ranks among the most important federal enactments of the past several

decades. I cannot see the sense of invalidating legislation of this magnitude in order to preserve a cumbersome, 65-year-old removal power that has never been exercised and appears to have been all but forgotten until this litigation.[1]

---

[1] For the reasons identified by the District Court, I agree that the Deficit Control Act does not violate the nondelegation doctrine. See *Synar* v. *United States*, 626 F. Supp. 1374, 1382–1391 (DC 1986).

JUSTICE STEVENS concludes that the delegation effected under § 251 contravenes the holding of *INS* v. *Chadha*, 462 U. S. 919 (1983), that Congress may make law only "in conformity with the express procedures of the Constitution's prescription for legislative action: passage by a majority of both Houses and presentment to the President." *Id.*, at 958. I do not agree. We made clear in *Chadha* that the bicameralism and presentation requirements prevented Congress from *itself* exercising legislative power through some kind of procedural shortcut, such as the one-House veto challenged in that case. But we also made clear that our holding in no way questioned "Congress' authority to delegate portions of its power to administrative agencies." *Id.*, at 953–954, n. 16. We explained: "Executive action under legislatively delegated authority that might resemble 'legislative' action in some respects is not subject to the approval of both Houses of Congress and the President for the reason that the Constitution does not so require. That kind of Executive action is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review as well as the power of Congress to modify or revoke the authority entirely." *Ibid.*

Although JUSTICE STEVENS seems to agree that the duties delegated to the Comptroller General under § 251 could be assigned constitutionally to an independent administrative agency, he argues that Congress may not give these duties "to one of its own agents." *Ante*, at 752–753. He explains that the Comptroller General fits this description because "most" of his statutory responsibilities require him to provide services to Congress, and because Congress has repeatedly referred to the Comptroller General as part of the Legislative Branch. See *ante*, at 741–746. "If Congress were free to delegate its policymaking authority" to such an officer, JUSTICE STEVENS contends that "it would be able to evade 'the carefully crafted restraints spelled out in the Constitution.'" *Ante*, at 755, quoting *Chadha*, 462 U. S., at 959. In his view, "[t]hat danger—congressional action that evades constitutional restraints—is not present when Congress delegates lawmaking power to the executive or to an independent agency." *Ante*, at 755.

I do not think that danger is present here, either. The Comptroller General is not Congress, nor is he a part of Congress; "irrespective of Con-

## I

The District Court believed it had no choice in this matter. Once it concluded that the Comptroller General's functions under the Deficit Control Act were constitutionally incompatible with the 1921 removal provision, the District Court considered itself bound as a matter of orderly judicial procedure to set aside the statute challenged by the plaintiffs. See *Synar* v. *United States*, 626 F. Supp. 1374, 1393 (DC 1986). The majority today does not take this view, and I believe it is untenable.

Under the District Court's approach, everything depends on who first files suit. Because Representative Synar and

gress' designation," he is an officer of the United States, appointed by the President. *Buckley* v. *Valeo*, 424 U. S. 1, 128, n. 165 (1976). In this respect the Comptroller General differs critically from, for example, the Director of the Congressional Budget Office, who is appointed by Congress, see 2 U. S. C. § 601(a)(2), and hence may not "exercis[e] significant authority pursuant to the laws of the United States," *Buckley* v. *Valeo, supra,* at 126; see U. S. Const., Art. II, § 2, cl. 2. The exercise of rulemaking authority by an independent agency such as the Federal Trade Commission does not offend *Chadha,* even though the Commission could be described as an "agent" of Congress because it "carr[ies] into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed." *Humphrey's Executor* v. *United States,* 295 U. S. 602, 628 (1935). I do not see why the danger of "congressional action that evades constitutional restraints" becomes any more pronounced when a statute delegates power to a Presidentially appointed agent whose primary duties require him to provide services to Congress. The impermissibility of such a delegation surely is not rendered "obvious" by the fact that some officers who perform services for Congress have titles such as "librarian," "architect," or "printer." See *ante,* at 758, n. 25 (STEVENS, J., concurring in judgment). Furthermore, in sustaining the constitutionality of the Federal Trade Commission's independent status, this Court noted specifically that the Commission "acts as a legislative agency" in "making investigations and reports thereon for the information of Congress . . . in aid of the legislative power." 295 U. S., at 628. JUSTICE STEVENS' approach might make some sense if Congress had delegated legislative responsibility to an officer over whom Congress could hope to exercise tight control, but even JUSTICE STEVENS does not claim that the Comptroller General is such an officer.

the plaintiffs who later joined him in this case objected to budget cuts made pursuant to the Deficit Control Act, the District Court struck down that statute, while retaining the 1921 removal provision. But if the Comptroller General had filed suit 15 minutes before the Congressman did, seeking a declaratory judgment that the 1921 removal power could not constitutionally be exercised in light of the duties delegated to the Comptroller General in 1985, the removal provision presumably would have been invalidated, and the Deficit Control Act would have survived intact. Momentous issues of public law should not be decided in so arbitrary a fashion. In my view, the only sensible way to choose between two conjunctively unconstitutional statutory provisions is to determine which provision can be invalidated with the least disruption of congressional objectives.

The District Court apparently thought differently in large part because it believed this Court had never undertaken such analysis in the past; instead, according to the District Court, this Court has "set aside that statute which either allegedly prohibits or allegedly authorizes the injury-in-fact that confers standing upon the plaintiff." 626 F. Supp., at 1393. But none of the four cases the District Court cited for this proposition discussed the problem of choice of remedy, and in none of them could a strong argument have been made that invalidating the other of the inconsistent statutory provisions would have interfered less substantially with legislative goals or have been less disruptive of governmental operations.[2]

---

[2] In *Myers* v. *United States*, 272 U. S. 52 (1926), the Court refused to enforce a statute requiring congressional approval for removal of postmasters. The Court's analysis suggested that there was no practical way the duties of the office could have been reformulated to render congressional participation in the removal process permissible. In *Springer* v. *Philippine Islands*, 277 U. S. 189 (1928), the Court removed from office several Philippine officials exercising executive powers but appointed by officers of the Philippine Legislature. As in *Myers*, the Court concluded that the offices by their very nature were executive, so the appointments

More importantly, the District Court ignored what appears to be the only separation-of-powers case in which this Court *did* expressly consider the question as to which of two incompatible statutes to invalidate: *Glidden Co.* v. *Zdanok,* 370 U. S. 530 (1962). The petitioners in that case had received unfavorable rulings from judges assigned to temporary duty in the District Court or Court of Appeals from the Court of Claims or the Court of Customs and Patent Appeals; they argued that those rulings should be set aside because the judges from the specialized courts did not enjoy the tenure and compensation guaranteed by Article III of the Constitution. Before the assignments, Congress had pronounced the Court of Claims and the Court of Customs and Patent Appeals to be Article III courts, implying that judges on those courts were entitled to Article III benefits. Older statutes, however, gave both courts authority to issue advisory opinions, an authority incompatible with Article III status. *Glidden* held that the Court of Claims and the Court of Customs and Patent Appeals were indeed Article III tribunals. With respect to the advisory-opinion jurisdiction, Justice Harlan's opinion for the plurality noted: "The overwhelming majority of the Court of Claims' business is composed of cases and controversies." 370 U. S., at 583. Since

---

could not have been rendered legal simply by trimming the delegated duties. In *Buckley* v. *Valeo,* 424 U. S. 1 (1976), the Court set aside Federal Election Campaign Act provisions granting certain powers to officials appointed by Congress, but it structured its remedy so as to interfere as little as possible with the orderly conduct of business by the Federal Election Commission. Past acts of the improperly constituted Commission were deemed valid, and the Court's mandate was stayed for 30 days to allow time for the Commission to be reconstituted through Presidential appointment. See *id.,* at 142–143. Finally, in *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.,* 458 U. S. 50 (1982), the Court set aside an exercise of judicial power by a bankruptcy judge, because his tenure was not protected in the manner required by Article III of the Constitution. To give Article III protections to bankruptcy judges, the federal bankruptcy statute would have had to be rewritten completely.

"it would be . . . perverse to make the status of these courts turn upon so minuscule a portion of their purported functions," Justice Harlan reasoned that, "if necessary, the particular offensive jurisdiction, and not the courts, would fall." *Ibid.* Justice Clark's opinion concurring in the result for himself and the Chief Justice similarly concluded that the "minuscule" advisory-opinion jurisdiction of the courts in question would have to bow to the Article III status clearly proclaimed by Congress, and not vice versa. *Id.*, at 587–589.

The Court thus recognized in *Glidden* that it makes no sense to resolve the constitutional incompatibility between two statutory provisions simply by striking down whichever provision happens to be challenged first. A similar recognition has underlain the Court's approach in equal protection cases concerning statutes that create unconstitutionally circumscribed groups of beneficiaries. The Court has noted repeatedly that such a defect may be remedied in either of two ways: the statute may be nullified, or its benefits may be extended to the excluded class. See, *e. g., Heckler* v. *Mathews*, 465 U. S. 728, 738 (1984); *Califano* v. *Westcott*, 443 U. S. 76, 89 (1979). Although extension is generally the preferred alternative, we have instructed lower courts choosing between the two remedies to "'measure the intensity of [legislative] commitment to the residual policy and consider the degree of potential disruption of the statutory scheme that would occur by extension as opposed to abrogation.'" *Heckler* v. *Mathews, supra,* at 739, n. 5, quoting *Welsh* v. *United States*, 398 U. S. 333, 365 (1970) (Harlan, J., concurring in result). Calculations of this kind are obviously more complicated when a court is faced with two different statutes, enacted decades apart, but *Glidden* indicates that even then the task is judicially manageable. No matter how difficult it is to determine which remedy would less obstruct congressional objectives, surely we should make that determination as best we can instead of leaving the selection to the litigants.

## II

Assuming that the Comptroller General's functions under § 251 of the Deficit Control Act cannot be exercised by an official removable by joint resolution of Congress, we must determine whether legislative goals would be frustrated more by striking down § 251 or by invalidating the 1921 removal provision. That question is not answered by the "fallback" provisions of the 1985 Act, which take effect "[i]n the event that any of the reporting procedures described in section 251 [of the Act] are invalidated." § 274(f)(1), 99 Stat. 1100. The question is whether the reporting procedures should be invalidated in the first place. The fallback provisions simply make clear that Congress would prefer a watered-down version of the Deficit Control Act to none at all; they provide no evidence that Congress would rather settle for the watered-down version than surrender its statutory authority to remove the Comptroller General. The legislative history of the Deficit Control Act contains no mention of the 1921 statute, and both Houses of Congress have argued in this Court that, if necessary, the removal provision should be invalidated rather than § 251. See Brief for Appellant United States Senate 31–43; Brief for Appellants Speaker and Bipartisan Leadership Group of United States House of Representatives 49; accord, Brief for Appellant Comptroller General 33–47. To the extent that the absence of express fallback provisions in the 1921 statute signifies anything, it appears to signify only that, if the removal provision were invalidated, Congress preferred simply that the remainder of the statute should remain in effect without alteration.[3]

---

[3] Although the legislative history on this point is sparse, it seems reasonably clear that Congress intended the removal provision to be severable from the remainder of the 1921 statute. An earlier bill, providing for removal of the Comptroller General only by impeachment or concurrent resolution of Congress, was vetoed by President Wilson on the grounds that Congress could not constitutionally limit the President's removal power or exercise such power on its own. See 59 Cong. Rec. 8609–8610

In the absence of express statutory direction, I think it is plain that, as both Houses urge, invalidating the Comptroller General's functions under the Deficit Control Act would frustrate congressional objectives far more seriously than would refusing to allow Congress to exercise its removal authority under the 1921 law.   The majority suggests that the removal authority plays an important role in furthering Congress' desire to keep the Comptroller General under its control.   But as JUSTICE WHITE demonstrates, see *ante*, at 770–773, the removal provision serves feebly for such purposes, especially in comparison to other, more effective means of supervision at Congress' disposal.   Unless Congress institutes impeachment proceedings — a course all agree the Constitution would permit — the 1921 law authorizes Congress to remove the Comptroller General only for specified cause, only after a hearing, and only by passing the procedural equivalent of a new public law.   Congress has never attempted to use this cumbersome procedure, and the Comptroller General has shown few signs of subservience.[4]   If Congress in 1921

---

(1920).   In the course of an unsuccessful attempt to override the veto, Representative Pell inquired: "If we pass this over the President's veto and then the Supreme Court should uphold the contention of the President, this bill would not fail, would it?   The bill would continue."   Representative Blanton answered, "Certainly."   *Id.*, at 8611.

[4] "All of the comptrollers general have treasured and defended the independence of their office, not alone from the president but also from the Congress itself. . . . Like the other institutions in the government, GAO depends upon Congress for its powers, its resources, and its general oversight.   But it also possesses continuing legal powers, of both long and recent standing, that Congress has granted it and that it can exercise in a quite independent fashion.   And the comptroller general, realistically speaking, is immune from removal during his fifteen-year term for anything short of a capital crime, a crippling illness, or insanity."   F. Mosher, A Tale of Two Agencies 158 (1984).   See also, *e. g.*, *Ameron, Inc.* v. *United States Army Corps of Engineers*, 787 F. 2d 875, 885–887 (CA3 1986); F. Mosher, The GAO 2, 240–244 (1979); H. Mansfield, The Comptroller General 75–76 (1939).

wished to make the Comptroller General its lackey, it did a remarkably poor job.

Indeed, there is little evidence that Congress as a whole was very concerned in 1921—much less in 1985 or during the intervening decades—with its own ability to control the Comptroller General. The Committee Reports on the 1921 Act and its predecessor bills strongly suggest that what was critical to the legislators was not the Comptroller General's subservience to Congress, but rather his independence from the President. See, *e. g.*, H. R. Rep. No. 14, 67th Cong., 1st Sess., 7–8 (1921); H. R. Conf. Rep. No. 1044, 66th Cong., 2d Sess., 13 (1920); S. Rep. No. 524, 66th Cong., 2d Sess., 6–7 (1920); H. R. Rep. No. 362, 66th Cong., 1st Sess., 8–9 (1919). The debates over the Deficit Control Act contain no suggestion that the Comptroller General was chosen for the tasks outlined in § 251 because Congress thought it could count on him to do its will; instead, the Comptroller General appears to have been selected precisely because of his independence from both the Legislature and the Executive. By assigning the reporting functions to the Comptroller General, rather than to the Congressional Budget Office or to the Office of Management and Budget, Congress sought to create "a wall . . . that takes these decisions out of the hands of the President *and the Congress.*" 131 Cong. Rec. 30865 (1985) (remarks of Rep. Gephardt) (emphasis added); see also, *e. g.*, *id.*, at 36089 (1985) (remarks of Rep. Weiss); *id.*, at 36367 (1985) (remarks of Rep. Bedell).

Of course, the Deficit Control Act was hardly the first statute to assign new functions to the Comptroller General; a good number of other duties have been delegated to the Comptroller General over the years. But there is no reason to believe that, in effecting these earlier delegations, Congress relied any more heavily on the availability of the re-

moval provision than it did in passing the Deficit Control Act. In the past, as in 1985, it is far more likely that Congress was concerned mainly with the Comptroller General's demonstrated political independence, and perhaps to a lesser extent with his long tradition of service to the Legislative Branch; neither of these characteristics depends to any significant extent on the ability of Congress to remove the Comptroller General without instituting impeachment proceedings. Striking down the congressional-removal provision might marginally frustrate the legislative expectations underlying some grants of authority to the Comptroller General, but surely to a lesser extent than would invalidation of §251 of Gramm-Rudman-Hollings—along with all other "executive" powers delegated to the Comptroller General over the years.[5]

---

[5] Many of the Comptroller General's other duties, including those listed by the majority, see *ante*, at 734, n. 9, appear to meet the majority's test for plainly "executive" functions—*i. e.*, they require the Comptroller General to "[i]nterpre[t] a law enacted by Congress to implement the legislative mandate," and to "exercise judgment concerning facts that affect the application of the [law]." *Ante*, at 733. Indeed, the majority's approach would appear to classify as "executive" some of the most traditional duties of the Comptroller General, such as approving expenditure warrants, rendering conclusive decisions on the legality of proposed agency disbursements, and settling financial claims by and against the Government. See 31 U. S. C. §§3323, 3526–3529, 3702; F. Mosher, A Tale of Two Agencies 159–160 (1984). All three of these functions were given to the Comptroller General when the position was created in 1921. See 42 Stat. 20, 24–25. I do not understand the majority's assertion that invalidating the 1921 removal provision might make the Comptroller General "subservient to the Executive Branch." *Ante*, at 734. The majority does not suggest that an official who exercises the functions that the Deficit Control Act vests in the Comptroller General must be removable by the President at will. Perhaps the President possesses inherent constitutional authority to remove "executive" officials for such politically neutral grounds as inefficiency or neglect of duty, but if so—and I am not convinced of it—I do not see how that power would be enhanced by nullification of a statutory provision giving similar authority to Congress. In any event, I agree with JUSTICE WHITE and JUSTICE STEVENS that the power to remove an officer for rea-

I do not claim that the 1921 removal provision is a piece of statutory deadwood utterly without contemporary signifi-cance. But it comes close. Rarely if ever invoked even for symbolic purposes, the removal provision certainly pales in importance beside the legislative scheme the Court strikes down today—an extraordinarily far-reaching response to a deficit problem of unprecedented proportions. Because I be-lieve that the constitutional defect found by the Court cannot justify the remedy it has imposed, I respectfully dissent.

sons of this kind cannot realistically be expected to make an officer "sub-servient" in any meaningful sense to the removing authority. Cf. *Hum-phrey's Executor* v. *United States*, 295 U. S., at 629.