# General Services Administration Use of Government Funds for Advertising

Section 632 of the Treasury, Postal Service, Executive Office of the President, and General Government Appropriations Act of 2000, which prohibits the use of appropriated funds for "publicity or propaganda purposes," does not prohibit the General Services Administration from using appropriated funds to support a reasonable and carefully-controlled advertising campaign that serves the goal of informing other federal agencies about the products and services it offers.

The principles set forth in some opinions of the Comptroller General addressing limitations on advertising by federal agencies beyond the "publicity or propaganda" rider would not prohibit the GSA's advertisements to other agencies.

January 19, 2001

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
GENERAL SERVICES ADMINISTRATION

You have asked whether section 632 of the Treasury, Postal Service, Executive Office of the President, and General Government Appropriations Act of 2000, Pub. L. No. 106-58, § 632, 113 Stat. 430, 473 (1999) ("General Government Appropriations Act of 2000"), which prohibits the use of appropriated funds for "publicity or propaganda purposes," disables the General Services Administration ("GSA") from expending money for advertising and promoting the services and programs it offers to other federal agencies. We believe that GSA may use appropriated funds for such advertising. The advertisements, however, must be aimed at providing information about GSA's offerings rather than aggrandizing or unduly emphasizing GSA's importance.[1] You have also asked whether, even apart from the "publicity or propaganda" rider, principles identified in opinions of the Comptroller General limiting advertising by federal agencies would prohibit the GSA's advertisements.

## I.

We understand that the advertisements in question give information to other federal agencies about the services and products that GSA offers. GSA "provides Federal agencies a myriad of supplies and services ranging from building construction and leasing of office space to providing personal property for virtually all agency needs." Letter for Randolph Moss, Acting Assistant Attorney General, Office of Legal Counsel, from George N. Barclay, Acting General Counsel, GSA at 2 (Nov. 12, 1998) ("GSA Letter"). In addition, the Federal Property and Administrative Services Act ("FPASA") charges GSA with the responsibility for

---

[1] We do not address the legality of any specific advertisements, which must be evaluated individually.

procuring services and supplies for federal agencies in a manner it determines to be "advantageous to the Government in terms of economy, efficiency, or service, and with due regard to the program activities of the agencies concerned." 40 U.S.C. § 481(a) (1994). These statutory duties include overseeing the provision of information technology services, *id*. § 757, procuring federal property, *id*. § 756, operating the federal motor vehicle fleet, *id*. § 491, and disposing of surplus property, *id*. § 484. GSA asserts that "[i]n order to demonstrate to Federal agencies the benefits of a single, centralized procurement activity and to fulfill the mandate expressed in the [FPASA], GSA believes that it is necessary and appropriate to educate, promote and advertise its activities to its federal customers." GSA Letter at 2. GSA argues, therefore, that

> the Administrator of General Services has the discretion to determine if advertising will further any of these statutorily authorized missions, thereby constituting a necessary and proper use of appropriated funds. . . . If the Administrator determines that certain forms of advertising or publicity are reasonable, necessary and proper in communicating the availability and advantages of GSA's programs, appropriated funds should be available for this purpose.

Letter for Emily C. Hewitt, General Counsel, General Services Administration, from George Barclay, Associate General Counsel, Personal Property Division, and Eugenia D. Ellison, Associate General Counsel, General Law Division, General Services Administration, *Re: Publicity and Propaganda Prohibition Clause Contained in Agency Appropriations Acts* at 2 (Nov. 6, 1998) ("GSA General Counsel Memorandum").

## II.

Section 632 of the General Government Appropriations Act of 2000, provides that "[n]o part of any appropriation contained in this or any other Act shall be used for publicity or propaganda purposes within the United States not heretofore authorized by Congress." A similar provision, in essentially the same form, has applied to GSA since 1989. *See, e.g*., Treasury, Postal Service, Executive Office of the President, and Certain Independent Agencies Appropriations Act, 1989, Pub. L. No. 100-440, § 513, 102 Stat. 1721 (Sept. 22, 1988).[2]

---

[2] The analogous statutory provision in the 1998 GSA appropriations act was section 601 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, Pub. L. No. 105-277, 112 Stat. 2681 (1998). A similar provision has been in other appropriations acts since 1952. *See, e.g*., Labor-Federal Security Appropriation Act, Pub. L. No. 82-134, § 702, 65 Stat. 209, 223 (1951).

Congress has enacted a number of statutes that restrict agencies' authority to spend funds for "publicity or propaganda" or lobbying.[3] All of these statutes raise substantial difficulties of interpretation. A "publicity or propaganda" rider such as section 632 creates the special difficulty that its language gives scant guidance about the line between what is permitted and what is forbidden. The Comptroller General, for example, has "consistently expressed [the] belief" that the language used in such riders "does not provide adequate guidelines under which to judge the activities of an agency, especially when balanced against the agency's legitimate interest in communicating with the public and with members of Congress for permissible purposes." *Rep. Benjamin S. Rosenthal*, B-184,648, 1975 WL 9457, at *6 (Comp. Gen. Dec. 3, 1975). The principal sources of guidance for construing this rider and other "publicity or propaganda" provisions are prior administrative interpretations, which are based largely upon general concepts about the structure of government.

Our Office's work in this general area has primarily focused on the Anti-Lobbying Act, 18 U.S.C. § 1913 (1994), and our "published opinions do not set out a detailed, independent analysis of 'publicity or propaganda' riders" in the appropriations statutes. *See* Memorandum for the Attorney General, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Anti-Lobbying Act Guidelines* at 3 (Apr. 14, 1995). Nevertheless, one distinction that runs through our Office's opinions in this general field bears particularly on the question you have asked. We have "sought to draw a distinction . . . between activities that are intended to 'give . . . information as to the work of [a] department,' and activities that seek to 'extol and exploit the virtues of [a] department.'" *Establishment of the President's Council for International Youth Exchange*, 6 Op. O.L.C. 541, 547 (1982) ("*International Youth Exchange*") (quoting 50 Cong. Rec. 4411 (1913) (remarks of Rep. Lever on precursor to 5 U.S.C. § 3107)). We have focused on whether the activity in question provides important information about the agency and the discharge of its statutory mandate or instead serves to aggrandize the agency or its officials. *See, e.g.*, Memorandum for the Deputy Attorney General from Ralph W. Tarr, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Hiring of Media Consultants to Advise Department Attorneys With Respect to Their Dealings with the Press* at 3 (Jan. 24, 1985) ("*Media Consultants*") (approving use of appropriated funds to support hiring media consultants if reasonably necessary to assist agency in performing its legitimate functions with

---

[3] *See, e.g.*, Pub. L. No. 106-58, § 627, 113 Stat. 430, 472 (1999) ("No part of any funds appropriated in this or any other Act shall be used . . . for publicity or propaganda purposes . . . designed to support or defeat legislation pending before the Congress, except in presentation to the Congress itself."); 5 U.S.C. § 3107 (1994) ("Appropriated funds may not be used to pay a publicity expert unless specifically appropriated for that purpose."); 18 U.S.C. § 1913 (1994) ("No part of the money appropriated by any enactment of Congress shall . . . be used . . . to favor or oppose, by vote or otherwise, any legislation or appropriation by Congress . . . .").

respect to press; cautioning, however, that consultants "should not and cannot be employed in any effort to emphasize unduly or aggrandize the accomplishments of the Department or its officials. . . . [W]hether a particular activity falls within this general area can be determined only on the facts of each case.").[4]

To be sure, "[t]he line between information and 'publicity' is almost impossible to draw, since any information about an agency's activity will publicize the agency, and almost all publicity will contain information about the government or about government programs." Memorandum for Joseph F. Dolan, Assistant Deputy Attorney General, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, *Re: Request of House Subcommittee for Interpretation of 5 U.S.C. § 54* at 3 (Mar. 1, 1963) (discussing predecessor to 5 U.S.C. § 3107). "Publicity or propaganda" riders, however, require attempts at drawing that line.

In attempting to do so here, we can take some guidance from the opinions of the Comptroller General and the General Accounting Office ("GAO").[5] Noting the vagueness of the language of "publicity or propaganda" riders in appropriations acts and the absence of legislative history shedding much light on their meaning, *see, e.g.*, *Rep. Jack Brooks*, 66 Comp. Gen. 707, 709 (1987); *Sen. David Pryor*, B-229,257, 1988 WL 227903, at *4 (Comp. Gen. June 10, 1988); *Sen. Lowell Weicker, Jr.*, B-223,098, 1986 WL 64325, at *6 (Comp. Gen. Oct. 10, 1986);

---

[4] *See also* Memorandum for the Attorney General from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Proposed Television Pilot/Series on the Drug Enforcement Administration* at 5-6 (Sept. 14, 1984) (upholding use of appropriated funds to cooperate with development of television series on Drug Enforcement Administration ("DEA"), in part because agency's activities "would be limited to the provision of accurate information concerning the DEA's activities, reviewing the accuracy and fairness of any subsequent dramatization of these stories, guarding against the misuse of the Department's seals or identity, and safeguarding, to the extent necessary, information in Department files," activities which would not "amount to the aggrandizement that is prohibited by statute."); Memorandum for Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Authority of the Office of Justice Assistance, Research, and Statistics* at 3 (Jan. 6, 1983) (permitting agency to use appropriated funds to support crime prevention advertising campaign but deeming significant the fact that advertisements in question would not make reference to the Federal government or its activities; therefore, advertisements were not produced "for the purpose of reflecting credit upon an activity or upon the officials charged with its administration."); *International Youth Exchange*, 6 Op. O.L.C. at 548, 549 (concluding that a "limited use of appropriated funds [by the United States Information Agency ("USIA")] to support a reasonable and carefully controlled advertising campaign by the [President's Council on International Youth Exchange]" in support of youth exchange programs was proper in part because USIA has specific statutory authority to promote such activities by the private sector, but "the proposed USIA advertising campaign should be carefully tailored and scrutinized so that it does not unduly emphasize the accomplishments of the USIA or aggrandize the agency or its officials.").

[5] The Comptroller General is an officer of the Legislative Branch, *see Bowsher v. Synar*, 478 U.S. 714, 727-32 (1986), and, historically, the Executive Branch has not considered itself bound by the Comptroller General's legal opinions if they conflict with the legal opinions of the Attorney General or this Office. Nonetheless, the Comptroller General's opinions can provide guidance on certain technical matters.

*Rosenthal*, B-184,648, 1975 WL 9457, at *6, the Comptroller General has construed the language to prohibit (among other things) "publicity of a nature tending to emphasize an agency's own importance, which [he has] labeled as 'self-aggrandizement.'" *Pryor*, B-229,257, 1988 WL 227903, at *5.[6] His interpretations of "publicity or propaganda" riders have acknowledged, however, that agencies have significant legitimate interests in publicizing their activities and programs. Recognizing that "every agency has a legitimate interest in communicating with the public and with the Congress regarding its functions, policies, and activities," 1 General Accounting Office, *Principles of Federal Appropriations Law* at 4-162 (2d ed. 1991) ("*Federal Appropriations Law*"), the GAO has stated that it is "reluctant to find a violation where the agency can provide a reasonable justification for its activities," *id*. at 4-165; *see also Sen. Thomas F. Eagleton*, B-178,528, 1978 WL 10850, at *2 (Comp. Gen. July 27, 1978). As the GAO's *Federal Appropriations Law* textbook states, "[i]n evaluating whether a given action violates a 'publicity or propaganda' provision, GAO will rely heavily on the agency's administrative justification. In other words, the agency gets the benefit of any legitimate doubt." 1 *Federal Appropriations Law* at 4-163.

Accordingly, in its most recent construction of such an appropriations rider, the Comptroller General determined that a report issued by the Department of Housing and Urban Development ("HUD") criticizing proposed congressional cuts in HUD programs did not violate the rider. *See Application of Anti-Lobbying Restrictions to HUD Report Losing Ground*, B-284,226.2, 2000 WL 1193462, at *3 (Comp. Gen. Aug. 17, 2000) (noting that "[p]ublic officials may report on the activities and programs of their agencies, may justify those policies to the public, and may rebut attacks on those policies."). Similarly, in its first construction of the ban, the Comptroller General concluded that some press releases issued by the National Labor Relations Board Division of Information ("NLRB") did not violate the rider because the rider does not prohibit "those functions [of the NLRB press office] which deal with dissemination to the general public, or to particular inquirers, of information reasonably necessary for the proper administration of the laws the duty for the enforcement of which falls upon [the NLRB]," *Appropriations—Limitations—Publicity And Propaganda Prohibition—Labor—Federal Security Appropriation Act, 1952*, 31 Comp. Gen. 311, 314 (1952), but rather was intended, like other statutory provisions similarly limiting appropriations expenditures, "to prevent publicity of a nature tending to emphasize the importance of the agency or activity in question," *id*. at 313; *Sen. Barry Goldwater*, B-194,776, 1979 WL 12361, at *1 (Comp. Gen. June 4, 1979) ("[T]his provision prohibits agency

---

[6] The Comptroller General has also construed the language to prohibit "covert propaganda activities carried on by covered agencies," *Pryor*, B-229,257, 1988 WL 227903, at *4, and certain grass-roots activities clearly designed to enlist the public in efforts to lobby Congress, *see, e.g., Rep. Glenard P. Lipscomb*, B-136,762, 1958 WL 2169, at *2 (Comp. Gen. Aug. 18, 1958). Neither of these interpretations is at issue here.

officials from using funds, subject to this restriction, solely for publicity of a nature tending to emphasize the importance of the agency or a particular agency activity."); *see also HUD Report Losing Ground*, B-284,226.2, 2000 WL 119346, at *3 ("The restriction is directed typically toward activities whose obvious purpose is 'self-aggrandizement' and 'puffery.'"); *Eagleton*, B-178,528, 1978 WL 10850, at *3 (finding that mass mailing by Republican National Committee of excerpts from newspapers praising president, transmitted with letter prepared by member of White House staff on State Department letterhead, did not violate similar prohibition, because "[i]n this case the expenditure of appropriated funds was not for the aggrandizement of the Department of State.").[7]

## III.

In light of the interpretation given to "publicity or propaganda" riders by our Office as well as by the Comptroller General, we believe that GSA would not be prohibited from using appropriated funds to support a reasonable and carefully-controlled advertising campaign that serves the goal of informing other federal agencies about the products and services available from GSA. The "publicity or propaganda" rider does not forbid an agency from providing information about its programs and activities, as long as the agency is not aggrandizing itself. Providing information is one means by which an agency achieves its mission. In this instance, moreover, the mission of the agency justifies presenting information in the form of advertising. Because of GSA's statutory mandate to procure services

---

[7] Our 1985 *Media Consultants* opinion cited only two cases in which the Comptroller General had found agency activity to violate a ban on unauthorized publicity. *Id*. at 4. In the first case, the Comptroller General concluded that because a speech by the Deputy Assistant Secretary of Defense was "clearly designed to enlist the aid" of an industry association in lobbying for defense programs, it went "far beyond the established practice of government agencies to keep the public informed of the aims and achievements of authorized government programs," and therefore violated the publicity and propaganda restriction. *Lipscomb*, B-136,762, 1958 WL 2169, at *2. The second case, *Federal Housing Administration—Conventions and Gatherings—Statutory Construction*, 14 Comp. Gen. 638 (1935), predated the inclusion of the rider in general appropriations statutes. In that case, the Comptroller General found that a campaign by the Federal Housing Authority to promote home owner improvements violated a specific statutory provision prohibiting it from sponsoring campaigns and conventions not otherwise authorized. *Id*. at 641. *See also Weicker*, B-223,098, 1986 WL 64325, at *1, *6 (noting that "suggested editorials" supporting Administration policies prepared by Small Business Administration for distribution to newspapers violate rider because they "are misleading as to their origin and reasonably constitute 'propaganda' within the common understanding of that term"); 1 *Federal Appropriations Law* at 4-161 to 4-179 (citing additional examples).

Editor's Note: The version of this opinion originally published online stated that the *Federal Appropriations Law* textbook cited only two cases in which the Comptroller General found activity to violate a ban on unauthorized publicity. Strictly speaking, it was the *Media Consultants* opinion that made this representation, regarding an outdated version of the GAO textbook, and not the second edition of *Federal Appropriations Law* that is discussed in the text of the opinion. This footnote has accordingly been revised to make clear that there are more examples than just the two identified in the *Media Consultants* opinion.

and supplies for federal agencies in a manner that it determines is "advantageous to the Government in terms of economy, efficiency, or service," 40 U.S.C. § 481(a), GSA's mission includes being a provider of goods and services to federal agencies. GSA advertisements that reasonably deal with the efficiency, economy, or quality of GSA products would carry out that mission and would not violate the "publicity or propaganda" ban. However, like the USIA advertising campaign, *see International Youth Exchange*, 6 Op. O.L.C. at 549, the proposed GSA advertising campaign should be carefully tailored so that it does not unduly emphasize the accomplishments of GSA or aggrandize the agency, its functions, or its officials, but rather provides information reasonably within GSA's statutory mandate. Proposed advertisements should inform potential customers about the qualities of GSA's products and services and offer the sort of information about GSA's capabilities that could affect potential customers' decisions regarding suppliers.[8]

## IV.

Finally, we do not believe that the principles set forth in some opinions of the Comptroller General addressing limitations on advertising by federal agencies beyond the "publicity or propaganda" rider would prohibit the GSA's advertisements to other federal agencies. The available opinions concern the use of appropriations to advertise to the general public, not to other agencies. Even assuming the standards set forth in these opinions would apply, GSA would apparently be permitted to advertise in order to inform other federal agencies about its products and services. The GAO has stated generally that

> [w]hether an agency's appropriations are available for advertising, like any other expenditure, depends on the agency's statutory authority. Whether to advertise and, if so, how far to go with it are determined by the precise terms of the agency's program authority in conjunction with the necessary expense doctrine and general restrictions on the use of public funds such as the various anti-lobbying statutes.

1 *Federal Appropriations Law* at 4-188; *see also Mr. Byrne A. Bowman*, B-114,874.30, 1976 WL 10445, at *2 (Comp. Gen. Mar. 3, 1976) (concluding that U.S. Postal Service's statutory mandate to "'provide philatelic services'" and "'promote[] and provide adequate and efficient postal services at fair and reasonable rates'" implies authority to advertise sale of stamps) (quoting 39 U.S.C. §§ 404(5) & 403(a)). Given GSA's statutory responsibility to ensure the procure-

---

[8] Even if GSA would get the benefit of any legitimate doubt about whether its advertisements are consistent with this limitation, the Administrator, as shown above, would not have unfettered discretion over the content of these advertisements.

ment of products and services for federal agencies in an economical and efficient manner, advertisements that inform other federal agencies of these products and services would seem to be a "necessary expense," as long as they do not violate other statutory limitations, such as the "publicity or propaganda" bar.

DANIEL L. KOFFSKY
*Acting Deputy Assistant Attorney General*
*Office of Legal Counsel*